Luba S. Kowalyszyn De MEDINA, Appellant,

v.

John E. REINHARDT, Director, United States International Communication Agency, et al.

Carolee Brady HARTMAN, Individually and on Behalf of All Other Persons Similarly Situated, et al. Rose Kobylinski and Luba Medina, Appellants,

v.

John REINHARDT, Director United States International Communication Agency.

Toura KEM, Luba Medina and Rose Kobylinski, Appellants,

v.

John REINHARDT, Director United States International Communication Agency.

Nos. 81–1909 to 81–1911.

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1982.

Decided Aug. 27, 1982.

As Amended Aug. 27, 1982.

Bruce A. Fredrickson, Washington, D. C., for appellants.

Robert E. L. Eaton, Jr., Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., at the time the brief was filed, Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.

Before WRIGHT and WALD, Circuit Judges and ANTHONY J. CELEBREZZE,* Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Senior Circuit Judge CELE-BREZZE.

WALD, Circuit Judge:

These appeals contest the district court's dismissal of consolidated individual and class sex discrimination claims against the Director of the United States International Communication Agency ("ICA" or "Agency"), formerly the United States Information Agency. Appellants contend that the district court (1) evaluated under inappropriate legal standards the statistical and testimonial evidence of a pattern and practice of discrimination in hiring, (2) failed to make required fact findings on the class promotion discrimination and retaliation claims, (3) improperly dismissed an individual claim for failure to exhaust administrative remedies, and (4) misapplied the requirements for a *prima facie* showing of discrimination to another individual claim. We find merit in certain of appellants' objections and therefore remand the class claims and the individual claim of Rose Kobylinski for further consideration. We affirm, however, the district court's dismissal of Luba Medina's individual claim.

## I. BACKGROUND

In March 1977, Luba Medina, a former Agency employee, filed an individual claim for damages and declaratory and injunctive relief under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e–2000e–17. Her complaint alleged that, since 1974, the Agency had refused to rehire her in retaliation for her own prior charges of sex discrimination and her husband's work on behalf of Agency minority employees. She also claimed that she had personally suffered from the Agency's discriminatory practices against the foreign-born and women. In late 1977, another job applicant, who had been denied employment by the Agency earlier in the year, filed a Title VII class claim on behalf of female applicants and employees against whom the Agency had discriminated in hiring and promotion. In April 1978, the class was conditionally certified "to include all women who have applied for employment with or are currently employed by the United States Information Agency and who have been or continue to be adversely affected by the discriminatory employment practices of the defendant." Joint Appen-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

dix ("J.A.") at 22. Later that month, an Agency contract employee filed a complaint charging that she had been denied a permanent Agency position on account of sex. In November the three cases were consolidated. In the interim, the district court had permitted Medina and two Agency employees, Josefina Martinez and Rose Kobylinski, to intervene as named plaintiffs and had allowed plaintiffs to supplement the class complaint to include a claim that the Agency maintained "a practice of reprisals against women who have filed sex discrimination charges against the Agency." J.A. at 28. On April 19, 1979, plaintiffs filed a motion for preliminary injunction to enjoin the defendant "from taking any retaliatory action against individuals who oppose the defendant's discriminatory practices or otherwise exercise their rights under Title VII." On May 16, the motion was denied orally without prejudice.

The parties agreed to bifurcate trial of the class claims into "liability" and "remedial" stages,[1] and a bench trial on liability was conducted from May 29, 1979 through June 5, 1979. On October 24, 1979, the district court issued an opinion and order which redefined the class to exclude women in clerical positions and dismissed the class claims. *Medina v. Reinhardt*, Nos. 77–0360, 77–2019 & 78–0762 (D.D.C. Oct. 24, 1979) (*Medina I*), J.A. at 68.

Plaintiffs filed appeals on December 21, 1979, but on September 19, 1980, this court dismissed the appeals under Fed.R.Civ.P. 54(b)[2] because the residual individual claims remained to be heard. Three of the named plaintiffs voluntarily dismissed their individual claims, and trial of Medina's and Kobylinski's claims was conducted on December 15 and 16, 1980. On June 15, 1981, the district court rendered its decision dismissing Medina's claim on the merits and Kobylinski's claim because she had failed to exhaust her administrative remedies. *Medina v. Reinhardt*, Nos. 77–0360, 77–2019 & 78–0762 (D.D.C. June 15, 1981) (*Medina II*), J.A. at 118. This appeal followed.

## II. THE CLASS CLAIMS

Although the district court's "Findings of Fact" discussed rebuttal evidence as well as evidence introduced by plaintiffs to establish their threshold case, the court ruled in its "Conclusions of Law" that the plaintiff class had failed to establish "a *prima facie* case of discrimination on the basis of sex," *Medina I* at 13, J.A. at 80. The court's conclusion rested primarily on rejection of both parties' statistical studies on hiring patterns as "misleading due to a failure to define adequately the relevant labor market from which the Agency draws for qualified

---

1. At the initial, "liability" stage of a pattern-or-practice suit the [plaintiff] is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. [Plaintiffs'] burden is to establish a prima facie case that such a policy existed....

 If an employer fails to rebut the inference that arises from the [plaintiffs'] prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy.... [A] court's finding of a pattern or practice justifies an award of prospective relief....

 When the [plaintiff] seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief.

 *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 360–61, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977).

2. **Judgment upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

 28 U.S.C. rule 54(b).

personnel," *id.* at 3, J.A. at 70. The court's objection was that the Census occupational categories used for comparison "with the jobs in issue at the Agency simply do not match." *Id.* at 6, J.A. at 73. We find, however, that the district court's opinion reflects a basic misperception of the relevancy and role of statistical evidence in the plaintiffs' *prima facie* showing; hence, we remand for a redetermination of whether plaintiffs can make out a *prima facie* case of sex discrimination. Further, we must remand because the court made no findings or comment on plaintiffs' evidence of Agency reprisals against women asserting their rights under Title VII.

Had the court credited either appellants' or appellee's definition of the relevant labor market, it would have found "disparities between the women employed at the Agency and the external labor pool of (1) Electronic Technicians, (2) Radio Broadcast Technicians, (3) Writers/Editors, and (4) Foreign Information Specialists." *Id.* at 8, J.A. at 75. In 1977, when the class action was initiated, these four categories accounted for a major part of the Agency's nonclerical positions. *See, e.g.,* United States Information Agency FY–1978 Affirmative Action Report (Plaintiff's Exhibit No. 22(b)). Consequently, on remand, the district court should reconsider whether these disparities alone or in combination with testimonial evidence[3] are sufficient to raise an

inference of discrimination in hiring and, if so, whether that inference was adequately rebutted. Upon remand, the court should also address the class retaliation claim.

### A. *Relevant Labor Market*

The 1972 amendments to the Civil Rights Act of 1964 came in response to the "persistence of discrimination" and the consequent need for more effective enforcement. H.R.Rep.No.238, 92d Cong., 1st Sess. 3 (1971), U.S.Code Cong. & Admin.News 1972, p. 2137. The legislative history particularly focused on the seriousness of sex discrimination, *id.* at 4–5, and explicitly recognized the need "[t]o correct ... entrenched discrimination in the Federal service." *Id.* at 24, U.S.Code Cong. & Admin.News 1972, p. 2159. It is noteworthy that Congress itself relied on "statistical evidence" to prove the existence of sex discrimination in higher level government jobs.

> Statistical evidence shows that minorities and women continue to be excluded from large numbers of government jobs, particularly at the higher grade levels.

> . . . . .

> This disproportionate distribution of minorities and women throughout the Federal bureaucracy and their exclusion from higher level policy-making and supervisory positions indicates the government's failure to pursue its policy of equal opportunity.

---

**3.** Plaintiffs introduced two types of testimonial evidence: (1) witness accounts of Agency rejection of their job applications upon which they sought to raise an inference of discriminatory motive, and (2) direct evidence of discriminatory motive (*e.g.,* testimony that an interviewer told a job applicant that "he wanted to fill the position with a man," Tr. at 35; J.A. at 137). Appellants protest that the court improperly focused on witness job qualifications in evaluating the second type of testimony. We do not read the opinion that way. The court held that "the evidence of individual instances of discrimination had [not] been made clear. While several of plaintiffs' witnesses may have been well-qualified for the positions for which they applied (*e.g.,* Ms. Kobylinski), the qualifications of most of them are very debatable at best." *Medina I* at 9, J.A. at 76. The court thus did not infer a pattern or practice of discrimination from the evidence that these women had been denied employment or

promotion. To the extent that a witness attempts to establish that an Agency decision not to hire or promote her was motivated by sex discrimination (the first type of testimonial evidence), the qualifications of the witness bear on whether the Agency personnel decision was based on legitimate rather than discriminatory reasons. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977); *Presseisen v. Swarthmore College,* 442 F.Supp. 593, 601 (E.D.Pa.1977), *aff'd,* 582 F.2d 1275 (3d Cir. 1978). The court dealt with the second type of testimony by observing that the "testimony concerning the atmosphere of discrimination at the Agency" had been controverted by testimony of defendant's witnesses that "they had neither perceived, nor experienced, employment practices which were designed to discriminate against, or preclude, the advancement of women in any manner." *Medina I* at 10–11, J.A. at 77–78.

*Id.* at 23, U.S.Code Cong. & Admin.News 1972, p. 2158. *See* S.Rep.No.415, 92d Cong., 1st Sess., 421–23 (1971). Congress thus extended to federal employees the right to bring individual and class actions under Title VII.

In a Title VII suit, the claimant "carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that . . . the employer is treating 'some people less favorably than others because of their race, color, religion, sex or national origin.'" *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 576–77, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977)). When a plaintiff submits sufficient evidence to *permit* such an inference, Title VII gives it the status of a "legally mandatory, rebuttable presumption." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 n.7, 101 S.Ct. 1089, 1094 n.7, 67 L.Ed.2d 207 (1981). Because unlawful discriminatory intent is typically elusive of direct proof, Congress has deemed it appropriate to then require an explanation of the defendant.

In a sex discrimination class action charging disparate treatment, appropriate statistical comparisons may be used to indicate whether similarly situated men and women have been treated similarly, *see, e.g., Valentino v. United States Postal Serv. (USPS)*, 674 F.2d 56, 69 (D.C.Cir.1982) (quoting *Valentino v. United States Postal Serv.*, 511 F.Supp. 917, 940 (D.D.C.1980)), and, if not, whether the difference in treatment shown supports an inference of discriminatory intent. *See, e.g., Teamsters*, 431 U.S. at 325 n.15, 97 S.Ct. at 1854 n.15. Where specialized skills are legitimately required for employment, "[t]he proper comparison is between the composition of the [employer's] work force and the qualified population." *Davis v. Califano*, 613 F.2d 957, 963 (D.C.Cir.1979) (As Amended Feb. 14, 1980). *See Valentino v. USPS*, 674 F.2d at 68. ("When the job qualifications in-

volved are ones that relatively few possess or can acquire, statistical presentations that fail to focus on those qualifications will not have large probative value.") We have recently restated, however, that not every conceivable qualification for every separate job must be taken into account in making out a *prima facie* class claim of discrimination: "[T]he qualifications a Title VII plaintiff must grapple with . . . are threshold or 'minimum objective' qualification." *Id.* at 71 n.24 (quoting *Davis v. Califano*, 613 F.2d at 964)). Thus, plaintiffs must identify the population likely to possess the minimum objective qualifications required of Agency employees (the relevant labor pool) and compare the proportion of women in that population with the proportion of women employed in the Agency. The comparisons in turn must show disparities of sufficient magnitude that they are statistically unlikely to have occurred by chance. We are then entitled to assume that "absent discriminatory employment practices, the proportion of the protected group in each of the job classifications and grade levels would approximate the proportion of the protected group with the minimum necessary qualifications . . . ." *Id.* at 964. *See, Teamsters*, 431 U.S. at 339 n.20, 97 S.Ct. at 1856 n.20. Thus, statistically significant disparities between the composition of an employer's work force and the labor pool from which the employer draws indicate that similarly situated people have been treated differently and "alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).

Here, because the district court did not reach the issue, we have no occasion to consider whether the magnitude of the statistical disparities shown was adequate to infer discriminatory motive. We are concerned in this appeal only with whether there is "a basis for a reasonable assumption" that the comparison population was qualified for Agency positions. *Metrocare v. Washington Metropolitan Area Transit Auth. (WMATA)*, 679 F.2d 922, 930 (D.C. Cir.1982). In this case, the experts testify-

ing on both sides proceeded through trial on the assumption that the population sufficiently well-qualified to be employed in Agency occupational categories was the population employed in those same occupations outside the Agency. We think this is a reasonable threshold assumption which follows from the Supreme Court's reasoning in *Hazelwood School Dist. v. United States.* In *Hazelwood*, a school district was charged with racial discrimination in teacher hiring, and United States Census data recording employment in the relevant occupational categories were used to calculate the disparities that formed the basis for plaintiffs' *prima facie* case. The Supreme Court specifically approved the technique, noting that "[t]he comparative statistics . . . were properly limited to public school teachers, and therefore this is not a case . . . in which the racial-composition comparisons failed to take into account special qualifications for the position in question." 433 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13. Thus, *Hazelwood* established that the proportion of a protected group actually *employed* elsewhere in the relevant occupation(s) is a meaningful measure of the proportion of the protected group *qualified* for employment by the defendant. The district court's opinion here, however, raises the question whether there is too much diversity within the occupations involved in this case to permit reliance on the *Hazelwood* assumption as a basis for the plaintiffs' *prima facie* showing. The district court concluded that the Census data used by the experts on both sides here was not sufficiently reflective of the qualifications required for Agency positions. The court insisted on "statistical data which *matches* those job categories at the Agency and the *specific* requirements thereof," *Medina I* at 7, J.A. at 74 (emphasis supplied), and concluded in its "Findings of Fact":

> 10. . . . The job categories used by the parties' experts do not correspond with the jobs in the defendant Agency. Neither do plaintiffs' nor defendant's experts adequately explain that the tasks actually performed by the employees at the Agency, in the job categories ana-

lyzed, correspond in any more than a very general and speculative way to those utilized by the parties' experts.

> 11. Cross-mapping of actual employee activities for purposes of comparison with statistics concerning available labor pools is appropriate and useful where the inquiry is of general non-specialized skills. While statistics are helpful and useful in many cases, it must be understood that *it cannot be argued or found in this case that precise labor pool availability figures can be derived to determine the number of females available for employment in such specialized fields as, for example, Cambodian language news analyst/writer/broadcaster.*

*Id.* at 8–9, J.A. at 75–76 (footnote omitted) (emphasis supplied).

■ While definition of the relevant labor market is normally reviewable under the "clearly erroneous" standard as an "essentially factual matter within the special competence of the district court," *Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir. 1981); see *Hazelwood*, 433 U.S. at 312–13, 97 S.Ct. at 2744, "if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, —— U.S. ——, —— n.15, 102 S.Ct. 2182, 2189 n.15, 72 L.Ed.2d 606 (1982). A close scrutiny of the legal underpinnings of the district court's fact finding is appropriate here because the court's decision was expressly based on its interpretation of the standard of proof enunciated in *Hazelwood* and *Teamsters.* The district court observed that *Hazelwood* "indicated that statistics comparing the employer's work force and the relevant labor market must be based on the labor pool *truly relevant* to the employer's potential work force," and concluded that "the statistics suffer from the following deficiency, as noted by the Supreme Court in *Teamsters*: Imprecise definitions of the relevant labor market when particular qualifications are required for the job(s) in question." *Medina I* at 12, J.A. at 79. We conclude, how-

ever, based on our examination of these cases, that the standard of precision the district court demanded, far from being mandated by these cases, is unprecedented and unjustifiable, insofar as it results in a total rejection of the Census data as a basis for statistical comparisons to establish a *prima facie* case.

The methods employed in this case by the experts on both sides to identify Census categories comparable to Agency positions, in fact, closely track that adopted in *Hazelwood* and by other courts, *see, e.g., Rivera v. City of Wichita Falls*, 665 F.2d 531 (5th Cir. 1982); *Croker v. Boeing Co. (Vertrol Div.)*, 437 F.Supp. 1138 (E.D.Pa.1977), *aff'd*, 662 F.2d 975 (3d Cir. 1981). Both experts subdivided the Agency work force into occupational categories and sought to translate each Agency category into Census terminology ("cross-map") by reference to the U. S. Department of Commerce, Bureau of the Census, Alphabetical Index of Industries and Occupations (1971) (Defendant's Exhibit No. 2) which lists "approximately . . . 23,000 occupation titles in alphabetical order." *Id.* at iii. The Alphabetical Index explains the design of the Census classification system which groups those titles under some 440 occupational categories. Each category includes all the titles considered to be part of the same occupation.

> To organize and make understandable the information relating to the many thousands of industries and occupations, a system of homogeneous grouping or classification must be used. Homogeneous titles are grouped together to form the various categories which comprise the system. . . . In this Index each title is identified by the code for that category to which it is assigned.

For example, plaintiffs' expert explained the composition of the Census category "Editors and Reporters."

> Census Code 184, covering editors and reporters, is a list of about 100 titles which all fit into a journalistic type of occupational group, including just, for example, editor, feature writer, foreign correspondent, newspaper writer, and newspaper editor.

Trial Transcript ("Tr.") at 82 (May 29, 1979) (testimony of M. Rosenblum).

The defendant's expert testified that in the "overwhelming majority of occupations" cross-mapping is accomplished by looking up the Agency position title in the Index and identifying the Census category to which it belongs. Tr. at 19 (June 1, 1979) (testimony of S. Wolfbein). Where relevant Agency job titles were not included in the Alphabetical Index, defendant's expert testified that he translated Agency categories into Census terminology based on job descriptions provided by the Agency. Tr. at 23 (June 1, 1979) (testimony of S. Wolfbein). Plaintiffs' expert testified that he consulted job descriptions in order to cross-map all the relevant positions.

> I consulted the 118 Manual to read the job description, as published by Civil Service, covering those Civil Service titles and codes that are used by all federal agencies.
>
> In a number of these instances I also consulted material published by the Agency, itself, to augment and fill in additional descriptions.
>
> So that I got a better sense in my own mind of specifically which Census occupational category would be appropriate for this cross-mapping exercise.

Tr. at 83 (May 29, 1979) (testimony of M. Rosenblum). Plaintiffs' expert testified that he also consulted an Office of Personnel Management ("OPM") study that translated white collar civil service jobs into Census terms, although he disagreed with OPM's cross-mapping in one instance.

Because the Census has fewer occupational categories (approximately 440) than the more detailed Civil Service system (over 1,000), the cross-mapping necessarily involved fitting some Agency occupational categories at issue in the class action into broader Census categories. For example, based on Census coding, the defendant's expert placed both the Agency positions entitled "Radio Broadcast Technician" and "Electronic Technician" in the Census category entitled "Electrical and electronic en-

gineering technicians." Tr. at 20, 93–94 (June 1, 1979) (testimony of S. Wolfbein). He also placed both "Writers/Editors" and "Foreign Information Specialists" in the Census category "Editors and Reporters." *Id.* 103–04. We are satisfied that comparing Agency occupational categories to the broader Census categories is appropriate because all types of jobs the Census includes within any given Census occupational category are sub-specialties of that occupation; thus, such aggregations retain "generally similar job skills" in common. *Valentino v. USPS,* 674 F.2d at 68. ("The burden of comparing appropriate groups in terms of minimum objective qualifications, onerous here because of the disparate occupational categories involved, is far more tractable when all members of the class are professional, administrative or technical employees with generally similar job skills and

seek [employment in or] advancement to positions involving those same skills."). Our conclusion is supported in this case by the more refined cross-mapping attempted where Agency occupations involved skills arguably reflected in more than one Census occupational category. As we have pointed out, the experts *agreed* on the basic methodology involved in identifying the relevant labor pool although they disagreed as to which Census occupational category more properly encompassed certain Agency positions. As these disagreements came only in fine-tuning the comparisons, however, they do not deprive the statistics of probative value, but, in fact, enhance it since the disagreements caused the experts to focus on specific Agency job requirements and tasks and thus accomplish the cross-mapping with considerable attention to detail.[4]

4. Plaintiffs' expert, for example, testified that he disagreed with defendant's expert on the classification of "Radio Broadcast Technician."

Q ... [I]n the category "Civil Service Code 3940," which is listed as radio-broadcast technician, according to your Exhibit 35, you put it in the Census Code 171, radio operator.
Is that correct?
A That is correct.
 ....
Q Did you consider the category 153, electronic technician?
A I reviewed that category and did not believe that it as accurately represented the appropriate cross-mapping as the category I used.
 ....
A number of the categories contain multiple references to occupations that are similar.
The weight must fall on a more detailed analysis of the job descriptions and the related categories that entail similar work.
The difference between those categories essentially would fall into the idea that the Category 153, which its full title is "Electrical and Electronic Engineering Technician," is a more technical and more skilled occupation than the radio operator.
And an examination of the definition in the *Handbook of Blue-Collar Occupational Families* put out by the Civil Service Commission, the Agency's own qualification sheet for radio-broadcast technician, and the *Standard Occupational Classification Manual,* would, in fact, lead one to the conclusion, as it did me, that the appropriate cross-map for radio-broadcast technician is radio operator, rather than the engineer.

I could read to you the entire list within the classified index of occupations coming under the categories both electronic and electrical-engineering technicians 153 and radio operators 171.
But, just briefly, under radio operator 171, it includes broadcast engineer, control-records and tape-recordings engineer, field engineer, transmission engineer. That is several of them.
And if we look at the radio-operator group in the *Standard Occupational Classification Manual,* the description for that job family "includes occupations involving operating and maintaining radio equipment for communications with aircraft ships and other ground stations and transmitting radio and television broadcasts."
I would also suggest that the job description of the Agency's own qualifications sheet for radio-broadcast technician and the detailed descriptions described for category 3940, radio-broadcast technician, in the *Handbook of Blue-Collar Occupations,* published by the U. S. Civil Service Commission, would clearly indicate that we are talking about a radio operator, and not the more detailed and highly skilled electronic-engineering technician, which is Census Code 153.
By Ms. Futch:
Q Is it then your testimony that, as a matter of professional judgment, you selected category 171 versus 153?
A Well, any time there is a difference in this kind of classification, it obviously would entail some professional judgment.
I believe a close reading of all of the evidentiary sources suggests that the category that I have selected is appropriate.

To the extent that the experts disagreed on the appropriate Census category to which Agency categories should be compared, we of course defer under the "clearly-erroneous" standard, *see* Fed.R.Civ.P. 52(a), to the district court's judgment as to which comparison has the *greater* probative value. And, we would not second-guess the district court as to other areas of disagreement between the experts which the court did not decide, *e.g.*, whether 1970 Census data or 1978 Labor Department data provided the appropriate set of figures. We decide only that the cross-mapping by both experts here provided an adequate basis from which to derive meaningful disparity figures in order to decide if a *prima facie* case of discrimination in hiring was made out.

■ A review of the statistical comparisons sanctioned in *Hazelwood* bolsters our conclusion that the district court imposed an inappropriately high standard of precision between Agency and Census job categories. The *Hazelwood* Court was satisfied with data that limited the relevant labor pool to those in the general Census occupational category of secondary school teachers although this data aggregated diverse teaching positions not subdivided on the basis of subject matter taught. Thus, the district court mistakenly relied on *Hazelwood* for authority that plaintiffs must provide data comparing the labor market for *every* combination of skills required in *every* one of the more than 2,000 Agency jobs at issue. We do not believe a plaintiff is required to prove that each individual in the comparison pool is qualified in every way for a particular Agency position. The objective is to define "a population that closely *approximates* the characteristics of those who would be *likely* to apply" and "meet legitimate threshold qualification require-

ments." D. Baldus & J. Cole, Statistical Proof of Discrimination 120 (1980) (emphasis supplied). The focus thus should be on whether the Census statistics give us a meaningful estimate of the proportion of women in the labor market reasonably likely to possess the minimum qualifications needed for the Agency jobs in question.

We agree with the district court that the ICA positions at issue are properly treated differently from the bulk of federal government jobs which are generally professional, administrative and managerial positions for which no differentiated training or educational standards are imposed as minimal qualifications. And we agree as well that the test was not met in a case like *Valentino*, where the statistics "did not group employees by job category," 674 F.2d at 70, nor "hone in on the wide variety of minimum objective qualifications required of applicants for the diverse . . . positions" at issue. *Id.* at 61. In *Valentino*, where discrimination in promotion was charged, it would indeed have been "irrational to assume 'equal qualifications' to fill engineering or secretarial vacancies," as the plaintiffs urged, simply because employees were "educated the same number of years and employed by the government for the same length of time." *Id.* at 71. *See also Metrocare v. WMATA*, 679 F.2d at 930 (no showing that "persons now holding secretarial or clerical jobs are qualified for [promotion to] managerial positions"). The data in this case, however, did hone in on the basic technical skills—"the *minimum objective qualifications*," *Valentino v. USPS*, 674 F.2d at 68 (quoting *Davis v. Califano*, 613 F.2d at 964)—prerequisite to employment in particular Agency occupational categories. The expert testimony reveals the comparisons of Agency and Census occupational categories

---

If we are looking at radio operator 171, let me read further from the *Handbook of Blue-Collar Occupational Families*, published by the Civil Service Commission, relating to radio-broadcast technician.

Some of these descriptions include duties of supervising or performing tasks associated with transmitters and antennas, broadcast studio consoles, radio and TV broadcasts, including starting up and shutting down the transmitter, adjusting tone and volume, monitoring through loudspeakers, headphones, or video, observing volume indicators, making minor repairs and changing parts, and keeping an operating log of the station.

That sounds to me pretty much like a radio operator.

Tr. 128–31 (May 29, 1979) (testimony of M. Rosenblum).

were based on common job requirements and were accomplished in some instances with much greater precision than in *Hazelwood*. It should be noted again that in *Hazelwood* the comparison pool included public school teachers whether they taught, for example, natural science or a foreign language.

■■■ Therefore we do not deem it fatal to plaintiffs' *prima facie* case that the Census occupational data failed to take account of foreign language skills prerequisite to employment in *certain* Agency positions. "[N]ot every conceivable factor relevant to [an employment] decision must be included in the statistical presentation . . . ." *Davis v. Califano*, 613 F.2d at 964. *See, e.g., Trout v. Hidalgo*, 517 F.Supp. 873 (D.D.C.1981):

> Certainly, plaintiffs' expert did not, in his analysis, account for each of the factors that the government suggests should have been considered. It is also true that a model which incorporated additional potentially relevant factors (such as type or quality of education and experience) would form a more perfect foundation for determinations regarding allegations of discrimination. However, *defendants have furnished no evidence that inclusion of the missing variables or refinement of others would have altered rejection of the hypothesis of no discrimination. Indeed, they failed to offer any evidence indicating that type of education and experience or quantity of experience per age was*

distributed unequally among . . . women and men in the . . . population.

517 F.Supp. at 881 (emphasis supplied). Here, many, if not most, of the jobs involved do not require foreign language skills at all.[5] Thus, to the extent that the district court rejected the statistics for failure to account for such skills, the court imposed an additional and unnecessary requirement for a large number of Agency positions. Further, with respect to positions which include specific foreign language skills among the minimum objective qualifications (*e.g.*, "Cambodian language news analyst/writer/broadcaster"), the court articulated no basis for the assumption that such skills are in fact unevenly distributed between men and women generally or in the particular occupations involved. The more logical assumption, barring proof to the contrary, is that equal numbers of men and women possess skill in any given language; thus, the *proportion* of women qualified for Agency positions would not necessarily change if this variable were included in the occupational data. And, practically, statistical data, so far as we can tell from the record, are simply not available correlating 440 Census occupational categories with several dozen foreign language skills;[6] in their absence, we think it appropriate here to afford plaintiffs the benefit of a *rebuttable* presumption of an equal distribution of the relevant language skills.[7] We underline that we are dealing

---

5. *See Talev v. Reinhardt*, 662 F.2d 888, 893 (D.C.Cir.1981) (ICA's Worldwide English Division broadcasts for many more hours each day than foreign-language programs). In fact, one of the named plaintiffs applied for a Writer/Editor position which did not require foreign language skills. Tellingly, the defendant has not pointed to evidence, easily accessible to him, of the number of positions that would require specific foreign language skills.

6. In contrast, in *Valentino*, the plaintiffs' expert did not submit qualification data that were available. *Valentino v. United States Postal Serv. (USPS)*, 674 F.2d 56, 71 n.23 (1982) ("Valentino's statistical analyst had the occupational codes for USPS Headquarters employees at level 17 and above; he did not explain why he did not pursue analyses utilizing them.").

7. The potential for injustice to the claimant argues for a reduced level of proof when relevant qualification data are unavailable; on the other hand, lowering the claimant's burden of proof increases the risk that the disproportionate impact observed in the record may be improperly attributed to the defendant's bias when it was caused by the application of legitimate selection criteria. Nevertheless, even if relevant variables are not accounted for in a plaintiff's proof, the disparities in treatment may be sufficiently large to raise legitimate questions about their cause.

 Both equitable considerations and, in Title VII cases, the policy of the statute, support a rebuttable presumption of an equal distribution of qualifications between minority and majority group applicants when data are un-

here with the showing necessary for a *prima facie* case only. "In a Title VII case, the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended *progressively* to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 225 n.8, 101 S.Ct. at 1094 n.8 (emphasis supplied). Exactness is not required at the *prima facie* stage. As a consequence, in rebuttal, a defendant need only raise "a genuine issue of fact as to whether it discriminated" and need not even "persuade the court that it was actually motivated" by nondiscriminatory reasons. *Id.* at 254, 101 S.Ct. at 1094. The defendant here is certainly entitled to rebut plaintiffs' showing with evidence, more readily availa-ble to it than to plaintiffs, that, as to certain jobs with foreign language requirements, there are disproportionately fewer qualified women candidates available or even that bona fide recruitment efforts have resulted in a proportionately lower number of qualified female applicants than men. *Cf. EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 185 n.8 (4th Cir. 1979) ("Requiring the defendant to show the inappropriateness of general population statistics in such situations follows the principle of allocation of proof to the party with the most ready access to the relevant information."). We find it significant here, however, that the defendants themselves did not argue to the trial court that failure to control for language invalidated the occupational comparisons.[8]

> available. The presumption should place on the defendant the burden of producing evidence from which it is possible to evaluate the likelihood that the disproportionate impact was caused by unequal qualifications. Possible sources of evidence include: (a) the defendant's recollection of prior applicants, (b) a random sample of potential applicants or the defendant's current applicants, (c) data on the qualifications of applicants processed by similarly situated decision makers, and (d) published work force or census data.
>
> The justification for placing this burden on the defendant is threefold. First, it was the defendant's selection process that produced the observed disproportionate impact, and it is he who is alleging that it is the product of differential qualifications among the applicants. Moreover, the defendant has better access to data on the qualifications of applicants than does the plaintiff. Second, the equal qualifications assumption is often reasonable since many unqualified people are deterred from applying by knowledge of qualifications requirements. Third, in Title VII cases, the logic of the Act's underlying purpose, which places on an employer the burden of *justifying* an adverse impact produced by a neutral selection rule, suggests that an employer whose discretionary selection process produces a substantial disproportionate impact, whose proof takes into account all relevant qualifications on which data are reasonably available, should shoulder a similar burden of coming forward with evidence that *explains* those results or suffer the inference that it was intentionally caused.
> D. Baldus & J. Cole, Statistical Proof of Discrimination 194–95 (1980).

**8.** The dissent would affirm on this issue because of "plaintiffs' failure to adjust their defi-nition of the relevant labor market to account for" the requirement of foreign language skills. Diss. Op. at 1015. We believe the dissent's analysis to be flawed. First, neither party raised such an objection to the relevant labor pool data at trial; it was raised by the district court in its findings. And then the only reference in those findings to language skills is the one example of a "Cambodian language news analyst/writer/broadcaster." *Medina I* at 9, J.A. at 75–76.

Second, the dissent would appear to require Title VII plaintiffs in an agency like the ICA to introduce, as part of their *prima facie* case, applicant flow data to demonstrate the distribution of language skills in the pool of those otherwise qualified. Diss. Op. at 1016 n.3. We cannot agree. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) ("There is no requirement . . . that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants."). Applicant-flow data may be "relevant," *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977), but "has to be carefully assessed in light of the particular situation in issue." *Patterson v. American Tobacco Co.*, 634 F.2d 744, 753 (4th Cir. 1980) (en banc), *rev'd on other grounds*, —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). Actual discrimination or the appearance of discrimination may discourage qualified women from applying; also, "[d]iscriminatory recruiting practices may skew the . . . composition of the applicant pool." *Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir. 1981) (citing B. Schlei & P. Grossman, Employment Discrimination Law 445 (1976)). *Cf. Dothard v. Rawlinson*, 433

We therefore cannot accept the district court's total rejection, as too imprecise, of both experts' comparisons of Agency occupational categories with Census occupational categories. Were trial courts to apply *Hazelwood* and *Teamsters* as the court did here, statistical evidence would rarely be acceptable in Title VII class actions because statistical evidence is virtually always lacking in the degree of precision demanded by the district court. "[I]n most cases, conditions are far from ideal, with incomplete qualification data and non-random samples being the rule rather than the exception," D. Baldus & W. Cole, *supra*, at 26–27. And yet the Supreme Court's "cases make it unmistakably clear that '[s]tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue." *Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856 (quoting *Mayor of Philadelphia v. Education Equality League*, 415 U.S. 605,

620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974)).

Thus relevant labor pool statistics are commonly used although it is rarely possible to be exact in the definition of the relevant labor pool. Sometimes imprecision works to the detriment of plaintiffs as well as defendants. For example, a comparison labor pool based on Census employment statistics does not include *all* those qualified. "[C]ensus statistics analyzing the population by job skill include[ ] in each skill category only people actually employed in those skill categories. People qualified for, but not employed in, such positions [are] omitted from the statistics quantifying the proportion of the population eligible for the type of employment in question." *Rivera v. City of Wichita Falls*, 665 F.2d at 544 n.19. Certain defects in statistical evidence may, of course, be fatal to a plaintiff's case, as in *Valentino* where comparisons were grossly imprecise or in a case, hypothesized in *Va-*

U.S. at 330, 97 S.Ct. at 2727 ("The application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory."). Thus, plaintiffs cannot be required to rely on data that, if their contentions even appear to be true, may be biased against them. But, even in the absence of reliable data, the dissent would punish "plaintiffs' failure to produce evidence on the matter," Diss. Op. at 1016 n.3, by refusing to make the logical inference that as many women as men speak any given language either as their mother tongue or as a second language. The dissent hypothesizes that factors not a matter of record, "such as the relative rate of immigration," *id.*, might affect the distribution of certain language skills. Of course evidence not in the record may also show women more likely than men to be fluent in a second language. *See, e.g.*, Department of Commerce, Statistical Abstract of the United States 1970, at 131 (14,-201 women earned bachelors degrees in foreign languages and literature compared with 5,321 men; 2,794 women, 2,071 men earned master's; 204 women, 503 men earned doctorates). The real point, however, is that the Census data on which plaintiffs relied did not correlate language with occupational skills, and, for want of this correlation, plaintiffs should not be thrown out of court.

Finally, and most importantly, we cannot accept the dissent's acceptance of the district court's perception of the *prima facie* case:

"[t]he district court seemed to require proof to a mathematical certainty, but there is no such requirement." *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 687 (6th Cir. 1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). Although "[d]eficiencies in the data base 'may, of course, detract from the value of such evidence,' ... [they] ordinarily would not obliterate its evidentiary value." *Id.* (quoting *Teamsters*, 431 U.S. at 340 n.20, 97 S.Ct. at 1856 n.20). Even so, the *Teamsters* caveat, echoed in *Hazelwood*, that labor pool statistics should reflect the qualified population should be understood in the context of a case in which *general population* figures were submitted. Courts have since questioned whether "*general* population and work force data [are] appropriate as the basis for statistical comparison" where special qualifications exist, *Patterson v. American Tobacco Co.*, 634 F.2d at 753–54 (emphasis supplied), but "*Hazelwood* did not entirely rule out [their] use [even] in 'special qualification' cases." *Id.* at 754 n.15. Here, the base data were not *general* work force data, but *occupation*-specific data. The dissent would require *job*-specific data, but the source of this requirement is unclear. Neither this court nor the Supreme Court has ever required Title VII class action plaintiffs to present nonexistent data on the population qualified for each *position*, as opposed to particular occupational categories. As we have observed, if such a requirement had been imposed, the statistics used in *Hazelwood* would have been inadequate for purposes of estimating the qualified population.

*lentino,* where the sample size is inordinately small. *Valentino v. USPS,* 674 F.2d at 66 n.12 (citing *Wilkins v. University of Houston,* 654 F.2d 388, 409 n.37 (5th Cir. 1981)) ("[T]he breakdown of highly specialized workplaces into occupational categories for the purpose of examining the treatment of similarly qualified employees may yield numbers too small to conduct certain types of statistical analyses relied upon to show discrimination in workplaces less specialized.") But because "statistical measures are necessarily imperfect in differing ways and varying degrees," the courts generally "accept what figures are available; allow for imperfections, skewing factors, and margins of error; and then take the figures for what they are worth. Sometimes this is much, sometimes little." *Phillips v. Joint Legislative Committee on Performance and Expenditure Review,* 637 F.2d 1014, 1025 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2233, 72 L.Ed.2d 845 (1982).

In the usual case, statistics are not intended to "conclusively prove intentional discrimination.... In recognition of [the] limits on the potential of statistics as a basis for an inference, the courts have given statistical proofs a question-raising, burden-shifting function." D. Baldus & W. Cole, *supra,* at 26–27. We find the base data here to be sufficiently precise and consistent with statistical and legal norms to *permit* an inference of discrimination if statistically significant disparities exist. We therefore remand for reconsideration of whether plaintiffs made a *prima facie* showing of Agency discrimination in hiring.

### B. *Required Findings*

 Plaintiffs also protest on appeal that, with respect to the class claims of promotion discrimination and retaliation,[9] the district court's opinion was deficient under Fed.R.Civ.P. 52(a) which requires that a court sitting without a jury "find the facts specially and state separately its conclusions of law thereon."[10] It is established that the requirement of fact findings cannot be met by a "statement of ultimate fact without the subordinate factual foundations for it which must be the subject of specific findings." *O'Neill v. United States,* 411 F.2d 139, 146 (3d Cir. 1969). Further, the fact findings must touch all material issues. "For this court to exercise adequately its power of review, the district court must make specific findings about the nature and truth of [plaintiffs'] allegations." *Borrell v. ICA,* 682 F.2d 981 at 992 (D.C.Cir.1982). Because the district court's opinion is bereft of reference to the retaliation claim, we must remand for findings on this issue. We are satisfied, however, with the court's findings on the promotion discrimination claim.

To support an inference of discriminatory promotion practices, the plaintiffs introduced undisputed government statistics showing the small percentage of women in higher level Agency positions. *E.g.,* the Agency's FY–1978 Affirmative Action Plan, Sec. C, Table 3 (Plaintiffs' Exhibit No. 22(b)); U. S. Civil Service Commission, Report on Review of Personnel Management in the United States Information Agency (Plaintiffs' Exhibit No. 23). The plaintiffs' proposed findings of fact with respect to the promotion claim were based on this statistical evidence and they object on appeal that the district court's opinion failed to include any reference to the data or the inferences to be drawn therefrom. We, too,

---

**9.** Plaintiffs' retaliation claim was brought under 42 U.S.C. § 2000e–3(a):

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**10.** Appellants argue that Rule 52(a) also required the court to make findings of fact upon denial of their motion for a preliminary injunction. We regard this issue to be moot.

find it troubling that, while the district court devoted five pages of fact findings to the statistical evidence related to the hiring discrimination claims, the court ignored the statistical evidence presented on the promotion claims. The court, however, acknowledged the allegation of promotion discrimination, stating the issue before it as "[w]hether the defendant's hiring, promotion and salary practices constitute patterns or practices of discrimination...." *Medina I* at 3, J.A. at 70. And, although the court did not specifically discuss the statistical evidence on promotion practices, it made findings based on defendant's testimonial evidence, concluding:

> In addition to [defendant's witnesses] very credible testimony, the fact that these women have attained the positions they now occupy, and have done so by rapid and consistent advancement, is dispositive of the absence of any pattern or practice of discrimination based on sex at the Agency at all relevant periods in this litigation.

*Medina I* at 11, J.A. at 78. The "ultimate fact," that there existed no pattern or practice of discrimination, was thus supported by the specific finding of instances of accelerated promotion of women and the credible testimony of women defense witnesses regarding the absence of discrimination in "the advancement of women in any manner." *Id.* at 11. While this court would have been aided by an explicit statement of the district court's reasons for rejecting the inference plaintiffs urged be drawn from the statistics, the district court provided findings "sufficient for a clear understanding of the basis of the decision." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2577 at 697 (1971).

In contrast, the district court's opinion failed to acknowledge the class retaliation claim. The court's recitation of the procedural history does not refer to the supplemental complaint alleging retaliatory practices nor do the "Findings of Fact" or "Conclusions of Law" address the claim. Because a retaliation claim does not depend on whether the challenged employment practices are determined to be unlawful, *see*

*Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1018–19 (D.C.Cir.1981), the court is required to address the retaliation issue independently.

### III. THE INDIVIDUAL CLAIMS

The individual discrimination claims of Luba Medina and Rose Kobylinski were the subject of a separate trial and a second opinion in which the court dismissed Medina's claim on the merits and denied jurisdiction over Kobylinski's claim because she had not filed a charge with the Equal Employment Opportunity Commission (EEOC), and thus had failed to exhaust her administrative remedies as required by 42 U.S.C. § 2000e–16. Since the trial, however, the Supreme Court has decided that the requirement of timely filing is akin to a statute of limitations and is not a jurisdictional prerequisite, *Zipes v. Trans World Airlines*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), and this court has held that "the critical factor in determining whether an individual Title VII plaintiff must file an EEOC charge, or whether he may escape this requirement by joining with another plaintiff who has filed such a charge, is the similarity of the two plaintiffs' complaints." *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C.Cir.1981). We reverse the district court's dismissal of Kobylinski's claim because we find that her claim was so similar to that made by Martinez, who had filed an EEOC charge and with whom Kobylinski intervened as a named plaintiff, "that it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges." *Id.* We affirm, however, the court's dismissal of Medina's claim as based on fact findings that are not "clearly erroneous."

### A. *Exhaustion of Administrative Remedies*

In *Foster v. Gueory*, this court reversed the district court's denial of a motion to intervene in a pending employment discrimination suit. The motion had been denied on the ground that the parties who sought

intervention had failed to exhaust their administrative remedies, but this court concluded that the purposes of the exhaustion requirement had been served by the initial plaintiffs' filing. The "principal functions of the EEOC filing requirement" are to enable "the EEOC to provide the alleged wrongdoer with notice and to permit possible conciliation." *Id.* at 1323. The *Foster* court concluded that separate filing is required of co-plaintiffs if there exists "a real possibility that one of the claims might be administratively settled while the other can be resolved only by the courts." *Id.* at 1322. But the court held that where two plaintiffs allege that they were similarly situated and received the same discriminatory treatment, the purposes of the exhaustion requirement are adequately served if one plaintiff has filed an EEOC complaint.[11] Here, the claims of Martinez and Kobylinski are virtually identical. Each claimed intentional sex discrimination (as opposed to disparate impact). Each was a GS–11 Agency employee who based her claim on defendant's failure to promote her (as opposed to a failure to hire). Each also charged that they performed like services for less pay than men of similar qualifications and experience. Thus, we find sufficient similarity between these claims to doubt the likelihood that conciliation would prove successful as to one where it had failed as to the other.

As the district court found in its order granting the motion to intervene, *Hartman v. Reinhardt*, No. 77–2019 (D.D.C. Sept. 18, 1978), J.A. at 23, plaintiff Martinez had exhausted administrative remedies with regard to her claims. *See* Notice of Final Decision of Agency (Aug. 30, 1978) (from EEO officer to Martinez). We therefore hold that Kobylinski was not required to file an EEOC charge, and remand her case to the district court for a decision on the merits.

## B. *Medina's Claim*

Appellant Medina protests that the dismissal of her individual claims was based on the district court's misinterpretation of the standard of *prima facie* proof enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, in dismissing Medina's claim, the court ultimately relied on the adequacy of defendant's rebuttal evidence. As the court's findings are not "clearly erroneous," we affirm the court's disposition of Medina's claim.

Medina claims that the Agency discriminated against her both on the basis of sex and in retaliation for her previous EEOC complaints and her husband's representation of minorities in EEOC actions. At trial she presented evidence regarding three separate instances of alleged discrimination: (1) the denial of the opportunity to retest for a newsroom position following an unsatisfactory test performance several months earlier; (2) the Agency's rejection of her application for a radio production

---

11. The court relied in part on a line of cases that establish that only one member of a class need file an EEOC charge.

The rationale of this line of cases was explained by Judge Griffin Bell:

It would be wasteful, if not vain, for numerous employees, all with the *same grievance*, to have to process many *identical* complaints with EEOC. If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume that the next one would be successful. (Emphasis added.)

*Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968). In class actions this rationale is invariably applicable, for the very fact that the suit is a class action means that the plaintiffs' claims not only share common questions of law and fact, but those claims are such that representative plaintiffs will fairly and adequately protect the interests of all plaintiffs of the class. Fed.R.Civ.Pro. 23(a)(3) & (4).

*Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C.Cir. 1981).

We do not rely on that line of cases here because recent Supreme Court precedent suggests that the class certified here may have been overbroad, *General Telephone Co. v. Falcon*, —— U.S. ——, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (employee claiming promotion discrimination was not properly representative of interests of applicants claiming hiring discrimination), and thus we do not presume from the mere fact of Kobylinski's class membership that there existed shared questions of law and fact.

position; and (3) the Agency's rejection of her application for a position as a foreign language broadcaster.

■ The district court found that Medina was entitled to retake the test and ordered the Agency to allow a retest, but the court further found that the Agency's denial of Medina's right to retest was a mistake rather than discrimination. As to the Agency's rejection of both job applications at issue, the court found that Medina's proof failed to satisfy the last of the four prerequisites to a *prima facie* showing enumerated in *McDonnell Douglas.* The court understood *McDonnell Douglas* to require that a discrimination plaintiff show:

(1) he or she is a minority group member;

(2) he or she applied for a job with the defendant and was qualified for the position;

(3) he or she was rejected despite his or her qualification; and

(4) after the rejection, the job remained open, and the defendant sought other applications.

*Medina II* at 8, J.A. at 125. To the extent that the court treated these factors as delineating the only circumstances that might give rise to an inference of unlawful discrimination, the court erred. In fact, *McDonnell Douglas* defines but one "model" of such circumstances. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 & n.6, 101 S.Ct. 1089, 1093 & n.6, 67 L.Ed.2d 207 (1981). But the district court's error is not dispositive because the court further stated that even if a *prima facie* case had been made out, the Agency had articulated legitimate nondiscriminatory reasons for its actions and that defendant's proof showed these reasons were not pretextual. This conclusion rested on the court's finding that "other qualified individuals were selected in lieu of Ms. Medina." *Medina II* at 10–11, J.A. at 127–28.

■ In reviewing the court's findings that the challenged personnel actions resulted from mistake in one instance and reflected legitimate employment decisions in the others, we are bound to give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," and we may not set aside these findings unless they are "clearly erroneous." Fed.R. Civ.P. 52(a). While, again, we would have been aided on review by discussion of the specific evidence upon which the court relied, we find, in the record, evidence that supports the court's findings. In assessing the qualifications of the man selected in lieu of Medina as Radio Production Specialist, the court relied on the application he submitted to the Agency which described a long career as a "News Director/Announcer." Defendant's Exhibit No. 38, J.A. at 409. The court based its findings as to the qualifications of persons selected as foreign language broadcasters upon the testimony of the Chief of the Ukranian Service of the Voice of America, who specifically identified her reasons for selecting the other candidates over Medina. Tr. at 200–01 (Dec. 16, 1980) (testimony of O. Dragan). We find no reason to abandon the presumption that the trial court correctly assessed the evidence and the witnesses' credibility. Finally, the court did not explain its conclusion that Medina was denied a retest by mistake rather than due to discrimination. We note, however, that the testimony about the incident recounts only that Medina was told there would be "no point" to a retest, Tr. at 102 (Dec. 15, 1980) (testimony of L. Medina), and that her initial performance had received "fairly severe ratings," EEOC Report of Investigation, Attachment F–1 (Affidavit of Bernard Kamenske (Nov. 29, 1976)), Defendant's Exhibit No. 39 (Pt. II). The district court could infer from this evidence that, while Medina ought to have been allowed to retest, which the court ordered, she was discouraged from doing so because of the extreme unlikelihood of her improving her performance sufficiently to meet the Agency's standards rather than because of discriminatory intent. Accordingly, we affirm the court's dismissal of Medina's claims of discrimination.

In view of the foregoing, the case is remanded to the district court for proceedings not inconsistent with this opinion.

*So Ordered.*

CELEBREZZE, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's disposition of the class promotion and retaliation claims. The majority properly remanded these class claims for more comprehensive findings of fact. The majority also properly concludes that the district court has jurisdiction to hear Ms. Kobylinski's claim. I believe, however, that the district court properly found that the plaintiffs had failed to establish a prima facie case of discrimination because the plaintiff's statistical evidence does not support an inference of discrimination. Therefore, I cannot agree with the majority's conclusion that the district court improperly discounted the statistical evidence when determining whether a prima facie case had been established.

The majority concludes that the plaintiffs' statistical proof [1] is sufficient to support an inference of discrimination and, thus, that the district court erred in assigning little weight to the evidence. It reasons that the relevant labor market, as defined by the plaintiffs, adequately reflects the qualifications necessary for employment by the Agency.[2] Although it concedes that many Agency positions require skill in a foreign language the majority concludes that the plaintiffs' failure to adjust their definition of the relevant labor market to account for this factor does not create a serious flaw in the statistical comparisons. In support of this conclusion, the majority asserts that we may logically assume that foreign language skills are equally distributed between men and women and that statistical data regarding foreign language skill may not be available. Finally, the majority indicates that the defendant should carry the burden of rebutting the plaintiffs' statistical evidence by showing

that female applicants are not so likely as male applicants to possess the requisite language skills.

I believe that the district court correctly concluded that the plaintiffs failed to establish a prima facie case. The question of whether the plaintiffs have established a prima facie case depends upon the weight assigned the statistical proof presented by the parties. The plaintiff, in order to establish a prima facie case, must produce sufficient evidence to raise an inference of discrimination on the part of the defendant. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Valentino v. United States Postal Service*, 674 F.2d 56, 67 (D.C.Cir.1982). When the plaintiffs seeks to raise the inference by means of statistical proof, they have the "burden of comparing appropriate groups in terms of minimum objective qualifications ..." Id. at 68. *See Id.* at 68 n.17, 71 n.24; *Wilkins v. University of Houston*, 654 F.2d 388, 408 (5th Cir. 1981). Thus, the plaintiffs must either produce statistical proof which compares the Agency's workforce with that segment of the labor market which possesses the minimum skills necessary for employment by the Agency (including language skills) or demonstrate the validity of their comparisons by showing that foreign language skill is not a minimum qualification for the job categories being compared. The plaintiffs have failed to make either showing; consequently, the statistical evidence is insufficient to raise an inference of discrimination and, thus, is insufficient to establish a prima facie case of discrimination.

The failure of the plaintiffs to include foreign language skill as a factor in defining the relevant labor market seriously flaws the statistical comparison made by

---

1. The plaintiffs statistical proof indicated that substantial disparities existed in four job categories: electronic technicians, radio broadcast technicians, writers/editors, and foreign information specialists. The plaintiffs' expert concluded that these disparities were statistically significant, with less than .05 probability that the disparities resulted from chance.

2. The experts of both parties compared the Agency job categories with the most similar job categories used by the Census Bureau in compiling its statistics. Upon completing the "cross-mapping," the expert then compared, in each job category, the percentage of the external labor force which is female with the percentage of the Agency's labor force which is female.

the plaintiffs. Generally, the relevant labor market is the group of workers from which the employer hires its employees. *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). When properly defined, the relevant labor market should contain only persons with the minimum qualifications necessary for the pertinent positions. *See Hazelwood School District v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977); *Ste. Marie v. Eastern Railway Ass'n*, 650 F.2d 395 (2nd Cir. 1981). If a comparison is made to an improperly defined labor market, the conclusions drawn may be misleading, because the data are likely to distort the population of a particular minority available to fill a particular position. *See Mayor v. Educational Equality League*, 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Davis v. Califano*, 613 F.2d 957, 964 (D.C.Cir.1979); *Wilkins v. University of Houston*, 654 F.2d 388, 398 n.13 (5th Cir. 1981). This circuit has concluded, therefore, that the relevant labor market includes only those persons who possess the minimum objective qualifications necessary for a person to be eligible for a particular position. *Davis v. Califano*, 613 F.2d at 964.

In light of these principles, the labor market used by the plaintiffs for purposes of comparison is overly broad because the foreign language skills were not considered in defining the market.[3] For example, the evidence indicated that a substantial disparity exists between the number of women employed by the Agency as writers and the number of available female writers. The relevant market, however, is narrower than the plaintiffs grouping. The district court found that many writers for the Agency must be fluent in a second language. The parties agree that this qualification is necessary, *see* Appellants' Brief, p. 50; a writer for the Agency must prepare materials for dissemination in other countries. The plaintiffs' statistical comparison fails to account for the additional foreign language qualifications; therefore, the data are too general to establish the existence or cause of any disparity. Because of this imprecision, the district court properly refused to infer discriminations from the plaintiffs' statistical comparisons.

The plaintiffs failed to establish that their evidence was entitled to more weight, by showing that foreign language skill was not a "minimum objective qualification." *Davis v. Califano*, 613 F.2d at 964. Similarly, the plaintiffs produced no evidence indicating that language skills are evenly distributed among men and women.[4] In short, the plaintiffs have failed to produce evidence which would support an inference of discrimination. Because the plaintiffs have failed to produce sufficient evidence, the district court's conclusion that the plaintiffs

**3.** The plaintiffs' statistics cannot be used to raise an inference of discrimination, as the majority urges, by means of an assumption that foreign language skills are evenly distributed among men and women. Such an assumption cannot be properly made by this court. First, the assumption is based on the premise that language skills are randomly distributed among the population. The distribution may not be random, however, because, as the majority notes, at note 8 *supra*, many factors not contained in the record may affect the distribution of language skills, such as the relative rate of immigration. Moreover, the majority's assumption unfairly excuses the plaintiffs' failure to produce evidence on the matter. Here, for example, the plaintiffs might have produced evidence regarding the distribution of language skills among the male and female applicants for positions with the Agency. This applicant flow data would have been sufficient to indicate the distribution of language skills. The plaintiffs bear the burden of producing such evidence, *Valentino v. United States Postal Service*, 674 F.2d at 68 n.17, 67 n.24 and this court should not relieve them from meeting this obligation by assuming the condition.

**4.** The plaintiffs have not produced any evidence indicating which jobs require foreign language skills. Thus, we do not know which positions require foreign language skills. The consequences of this failure must be borne by the plaintiffs, because they bear the burden of raising an inference of discrimination, *Valentino*, 674 F.2d at 68 n.17, and because they bear the burden of demonstrating the relevance of their statistical evidence. *See Ste. Marie v. Eastern Railway Ass'n.*, 650 F.2d 395, 401 n.6 (2nd Cir. 1981). *See generally Valentino*, 674 F.2d at 71 n.24.

did not establish a prima facie case should be affirmed.