**Mechele VINSON, Appellant**

v.

**Sidney L. TAYLOR, et al.**

**No. 80–2369.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 16, 1982.

Decided Jan. 25, 1985.

Rehearing En Banc Denied
May 14, 1985.*

---

**86.** 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

* Circuit Judge Bork filed a dissent in which Scalia and Starr, circuit judges, joined. The dissent will be published in 760 F.2d.

Patricia J. Barry, Avila Beach, Cal., for appellant.

Ronald A. Schechter for amici curiae, Equal Rights Advocates, Inc., et al., urging reversal.

Fred Robert Troll, Jr., Hyattsville, Md., for appellee Capital City Federal Sav. and Loan Ass'n of Washington, D.C.

Before ROBINSON, Chief Judge, WRIGHT, Circuit Judge, and NOR-THROP,* Senior District Judge.

Opinion for the Court filed by Chief Judge ROBINSON.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

This appeal presents principally the question whether a corporate employer is accountable under Title VII of the Civil Rights Act of 1964,[1] as amended by the Equal Employment Opportunity Act of 1972,[2] for its supervisor's sexual harassment of a woman employee notwithstanding the employer's lack of actual knowledge thereof. The District Court answered in the negative.[3] We conclude that this holding is inconsistent with the intent of Title VII, and accordingly reverse.

### I

We launch our review with a summary of the pertinent facts, as they were accepted by the District Court. In 1974, appellant

---

* Of the United States District Court for the District of Maryland, sitting by designation pursuant to 28 U.S.C. § 294(d)(1982).

1. Pub.L. No. 88–352, tit. VII, 78 Stat. 253 (codified as amended at 42 U.S.C. §§ 2000e et seq. (1982)) [hereinafter cited as codified].

2. Pub.L. No. 92–261, 86 Stat. 103.

3. *Vinson v. Taylor,* 23 Fair Empl.Prac.Cas. (BNA) 37, 42 (D.D.C.1980).

Mechelle Vinson met appellee Sidney L. Taylor, who was a vice president of appellee Capital City Federal Savings and Loan Association and the manager of its Northeast Branch.[4] At Vinson's request, Taylor gave her an application for employment which she completed and returned, and promptly thereafter she was hired by Capital City.[5] With Taylor as her supervisor,[6] Vinson began her employment as a teller-trainee, and thereafter was promoted successively to teller, head teller, and finally to assistant branch manager.[7] It is undisputed, and the District Court expressly found, that Vinson's advancement was achieved on merit alone.[8] Vinson worked at the Northeast Branch for four years, when she took indefinite sick leave,[9] and was discharged two months later for excessive use of that leave.[10]

Vinson brought an action under Title VII against Taylor and Capital City,[11] alleging that she had been victimized by sex discrimination in the form of sexual harassment by Taylor.[12] At trial, the evidence bearing on Taylor's behavior during Vinson's employment was conflicting. Vinson testified that Taylor asked her to have sexual relations with him, claiming that she "owed him" because he had obtained the job for her; that after initially declining his invitation she ultimately yielded, but only because she was afraid that continued refusal would jeopardize her employment.[13] She further testified that thereafter she was forced to submit to sexual advances by Taylor at the Northeast Branch both during and after business hours, and that of-

---

**4.** *Id.* at 38. This specific fact was not among the explicit findings of the District Court, but is undisputed. *Id.*

**5.** *Id.*

**6.** *Id.* at 42 (findings of fact ¶ 1).

**7.** *Id.* (findings of fact ¶ 2). This finding states that Vinson became "administrative" branch manager. All other references to Vinson's ultimate position, in the record and in the court's opinion, speak of it as "assistant" branch manager. See *id.* at 38.

**8.** *Id.* at 42 (findings of fact ¶ 3).

**9.** *Id.* at 43 (findings of fact ¶¶ 16, 17).

**10.** *Id.* (findings of fact ¶ 18).

**11.** *Vinson v. Taylor,* Civ. No. 78–1793 (D.D.C.).

**12.** Complaint ¶¶ 2, 8, *Vinson v. Taylor,* Civ. No. 78–1793 (D.D.C.), Appendix for Appellant (A.App.) 10. Capital City moved to strike Vinson's appendix on the ground that it incorporates matter not admitted as substantive evidence at trial. Since we do not rely upon any of the offending material, we deny the motion as moot.

Vinson also invoked the Fifth Amendment and 42 U.S.C. § 1985(2) (1982) as bases for relief. Complaint, *supra,* ¶ 2, App. 10. At oral argument, Vinson's counsel conceded that there was no valid Fifth Amendment claim, and that the § 1985(2) claim cannot withstand *Great Am. Fed. Savs. & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

Vinson moved unsuccessfully for leave to amend her complaint, which asserted only federal claims, to show supplementally her discharge by City, to request reinstatement and other relief, and to add two nonfederal causes of action. This effort came more than fourteen months after filing of the complaint and more than a year after the discharge, but less than two months before the trial date and shortly before the close of discovery; and the motion did not attempt to explain the long delay. See A.App. 32. The District Court denied the motion on the ground that it could have been made much earlier and thus could have avoided the need to reopen discovery and postpone the trial. *Vinson v. Taylor,* Civ. No. 78–1793 (D.D.C. Jan. 8, 1980) (memorandum) at 1–2, A.App. 54–55. Vinson's assignment of this ruling as error is not well taken. While leave to amend must "be freely given when justice so requires," Fed.R. Civ.P. 15(a), a grant of the motion here would have subjected the defendants to the burden of additional discovery, preparation and expense, thereby prejudicing their right to a prompt and inexpensive trial. In these circumstances, we cannot say that the court's action was an abuse of discretion. See *Serrano Medina v. United States,* 709 F.2d 104, 106 (1st Cir.1983); *PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 417 F.2d 659, 664 (9th Cir.1969), *cert. denied,* 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970); *DeBry v. Transamerica Corp.,* 601 F.2d 480, 492 (10th Cir.1979). We intimate no view on the disposition to be made should Vinson renew the motion on remand of this case.

**13.** *Vinson v. Taylor, supra* note 3, 23 Fair Empl. Prac.Cas. (BNA) at 38. This court was not furnished a complete transcript of the proceedings at trial. Citations, therefore, are to the District Court's opinion rather than to the trial record.

ten Taylor assaulted or raped her.[14] In addition, she avowed, Taylor caressed her on the job, followed her into the ladies' room when she was there alone, and at times exposed himself to her.[15] Vinson added that Taylor also fondled other women employees,[16] and she attempted to call witnesses to support this charge, but the District Court would not allow her "to present wholesale evidence of a pattern and practice relating to sexual advances to other female employees in her case in chief, but advised her that she might well be able to present such evidence in rebuttal to the defendants' cases."[17]

Taylor denied Vinson's accusations of sexual activity and contended that Vinson aired them in retaliation for a business-related dispute.[18] Capital City also controverted Vinson's story, and asserted that any sexual harassment by Taylor was unknown to and unauthorized by it.[19] The District Court rendered judgment for Taylor and Capital City [20] on the grounds that Vinson had not been subjected to sexual harassment or discrimination,[21] and that in any event Capital City would not be accountable.[22] Our interpretation of Title VII leads us to disagree.

## II

We first address the District Court's holding that Vinson did not make out a case of sex discrimination, even against Taylor. Given due deference to the court's findings of fact,[23] we believe that in critical respects they fatally undermine the legal conclusion that Vinson did not suffer a violation of Title VII.

The District Court found that Vinson "was not required to grant Taylor or any other member of Capital sexual favors as a condition of either her employment or in order to obtain promotion."[24] That finding would have significance had Vinson been confined to a theory of discrimination based upon an imposition of sex-oriented conditions to her employment status. An infringement of Title VII is not, however, necessarily dependent upon the victim's loss of employment or promotion.[25]

Depending upon the particular facts, at least two separate avenues may be open to a Title VII plaintiff for a demonstration of unlawful sex discrimination. The first was recognized in *Barnes v. Costle*,[26] where we held that abolition of the job of a female

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.* at 38–39 n. 1. Appellant challenges this ruling on appeal, Brief for Appellant at 37, and later we address it. See text *infra* at notes 39–41.

18. *Vinson v. Taylor, supra* note 3, 23 Fair Empl. Prac.Cas. (BNA) at 39.

19. *Id.*

20. *Vinson v. Taylor,* Civ. No. 78–1793 (D.D.C. Feb. 26, 1980). The District Court rejected a challenge to its jurisdiction, advanced on the ground that Vinson had not filed a complaint with the Equal Employment Opportunity Commission (EEOC) before coming into court. See 42 U.S.C. § 2000e-5 (1982). Because Vinson received a right-to-sue notice from EEOC after institution of her suit, the court sustained its jurisdiction. *Vinson v. Taylor, supra* note 3, 23 Fair Empl.Prac.Cas. (BNA) at 40. While this holding has not been attacked on appeal, we note that it is now firmly established that a

timely filing with EEOC is not a jurisdictional prerequisite to suit in a district court. *Zipes v. Trans World Airlines,* 455 U.S. 385, 392–398, 102 S.Ct. 1127, 1132–1135, 71 L.Ed.2d 234, 243–247 (1982); *De Medina v. Reinhardt,* 222 U.S.App. D.C. 371, 386, 686 F.2d 997, 1012 (1982); *Thompson v. Sawyer,* 219 U.S.App.D.C. 393, 425 n. 36, 678 F.2d 257, 289 n. 36 (1982); *Gordon v. National Youth Work Alliance,* 218 U.S.App.D.C. 337, 340–341, 675 F.2d 356, 359–360 (1982); *Saltz v. Lehman,* 217 U.S.App.D.C. 354, 355, 672 F.2d 207, 208 (1982).

21. *Vinson v. Taylor, supra* note 3, 23 Fair Empl. Prac.Cas. (BNA) at 43.

22. *Id.* at 42.

23. See Fed.R.Civ.P. 52(a).

24. *Vinson v. Taylor, supra* note 3, 23 Fair Empl. Prac.Cas. (BNA) at 42 (findings of fact ¶ 4).

25. *Bundy v. Jackson,* 205 U.S.App.D.C. 444, 456, 641 F.2d 934, 946 (1981).

26. 183 U.S.App.D.C. 90, 561 F.2d 983 (1977).

employee because she spurned her male superior's sexual advances was an infringement of Title VII.[27] The second approach is illustrated by *Bundy v. Jackson,*[28] decided after the District Court's judgment herein, where we sustained a Title VII cause of action in favor of a woman employee seeking relief simply for pervasive on-the-job sexual harassment by her superiors.[29]

■■■■ Vinson's grievance was clearly of the latter type [30] and, accordingly, her case counseled an inquiry as to whether Taylor "created or condoned a substantially discriminatory work *environment,* regardless of whether the complaining employees lost any tangible job benefits as a result of the discrimination." [31] The District Court did

not undertake a determination on whether a Title VII violation of this nature had occurred.[32] It follows that we must remand in order that the court may ascertain whether, as in *Bundy,* Vinson was subjected to "sexually stereotyped insults" or "demeaning propositions" that illegally poisoned the "psychological and emotional work environment." [33]

The District Court further found that [i]f [Vinson] and Taylor did engage in an intimate or sexual relationship during the time of [Vinson's] employment with Capital, that relationship was a voluntary one by [Vinson] having nothing to do with her continued employment at Capital or her advancement or promotions at that institution.[34]

27. *Id.* at 99, 561 F.2d at 992.

28. *Supra* note 25.

29. 205 U.S.App.D.C. at 453–454, 641 F.2d at 943–944.

30. Although both *Barnes* and *Bundy* involved Title VII claims of sexual harassment, the situations they respectively addressed and the resulting holdings are sharply distinct. The differences are well summarized in EEOC's Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11 (1984) [hereinafter cited as *Guidelines* ]. In EEOC's words,

[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, [or] submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual....

*Id.* § 1604.11(a). That is *Barnes* -type harassment, and a transgression of Title VII. See *Barnes v. Costle, supra* note 26, 183 U.S.App.D.C. at 97, 561 F.2d at 990. A violation also occurs when "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment," 29 C.F.R. § 1604.11(a) (1984)—*Bundy* -type harassment. See *Bundy v. Jackson, supra* note 25, 205 U.S.App.D.C. at 453–454, 641 F.2d at 943–944.

31. *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 453–454, 641 F.2d at 943–944 (emphasis ·in original).

32. The District Court stated that Vinson "was not the victim of sexual harassment and was not

the victim of sexual discrimination while employed at Capital...." *Vinson v. Taylor, supra* note 3, 23 Fair Empl.Prac.Cas. (BNA) at 43 (findings of fact ¶ 21). Though included among the court's findings of fact, that label is not controlling, e.g., *Smith v. Fletcher,* 80 U.S.App. D.C. 263, 152 F.2d 20 (1945), and we cannot tell whether the court meant that in the legal sense Vinson was not victimized—because her situation did not qualify under *Barnes,* see *id.* pt. V and text *supra* at note 30, or because her relationship with Taylor was thought to have been voluntary, see text *infra* at note 34—or whether the statement was intended as the ultimate resolution of the conflicting evidence on Taylor's behavior toward Vinson. If the latter, it is not acceptable as such. A finding of fact must, at minimum, furnish enough detail to disclose the steps by which the court arrived at its conclusion the factual issue, see *Kelley v. Everglades Drainage Dist.,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485, 1489 (1943); *Fehringer v. Bluebeard's Castle, Inc.,* 395 F.2d 851 (3d Cir. 1968); *Denofre v. Transportation Ins. Rating Bureau,* 532 F.2d 43, 45 (7th Cir.1976); *Anderson v. City of Albuquerque,* 690 F.2d 796, 803 (10th Cir.1982), otherwise "[i]t is impossible to tell from [it] upon what underlying facts the court relied, and whether proper statutory standards were observed." *Schneiderman v. United States,* 320 U.S. 118, 130, 63 S.Ct. 1333, 1339, 87 L.Ed. 1796, 1804–1805 (1943). The finding of non-harassment and non-discrimination is fatally lacking when measured by that standard.

33. *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 454, 641 F.2d at 944.

34. *Vinson v. Taylor, supra* note 3, 23 Fair Empl. Prac.Cas. (BNA) at 42 (findings of fact ¶ 5).

This finding leaves us uncertain as to precisely what the court meant. It could reflect the view that there was no Title VII violation because Vinson's employment status was not affected, an error to which we already have spoken. Alternatively, the finding could indicate that because the relationship was voluntary there was no sexual harassment—no "[u]nwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature ... ha[ving] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." [35] If, however, the evidence warranted a finding of sexual harassment by that standard, Vinson's "voluntar[iness]" had no materiality whatsoever.[36]

■ *Bundy* held that a woman employee need not prove resistance to sexual overtures in order to establish a Title VII claim of sexual harassment.[37] From that point we take what is hardly a major step by recognizing that a victim's capitulation to on-the-job sexual advances cannot work a forfeiture of her opportunity for redress. If capitulation were dispositive, the "cruel trilemma" identified in *Bundy*—in which a victim must choose among acquiescence in the harassment, opposition to it, or resignation from her job [38]—would be an even more hideous quadrilemma featuring a fourth option—to yield and thereby lose all hope of legal redress for being put in this intolerable position in the first place. We

cannot ascribe to Congress a willingness to visit such an unenviable quandary upon an employee. A victim's "voluntary" submission to unlawful discrimination of this sort can have no bearing on the pertinent inquiry: whether Taylor made Vinson's toleration of sexual harassment a condition of her employment.

■ Another matter, an evidentiary ruling, prompts brief discussion. The District Court refused to allow Vinson to elicit, from other women under Taylor's supervision during her tenure, testimony that assertedly would have established that Taylor sexually harassed them also. Some testimony of this kind was admitted on the issue of notice to Capital City of Taylor's behavior, but Vinson was not permitted to use it in her case-in-chief for other purposes.[39] *Bundy* makes clear that evidence tending to show Taylor's harassment of other women working alongside Vinson is directly relevant to the question whether he created an environment violative of Title VII.[40] Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive.[41] The District Court erred when it denied Vinson the opportunity to demonstrate that Taylor had directed his advances toward other women also.

### III

The District Court also ruled that Vinson's employer, Capital City, could not be

---

**35.** *Guidelines, supra* note 30, 29 C.F.R. § 1604.-11(a) (1984).

**36.** The District Court did not elaborate on its basis for the finding of voluntariness, but it may have considered the voluminous testimony regarding Vinson's dress and personal fantasies. See Appendix for Appellee 42–50. Since, under *Bundy,* a woman does not waive her Title VII rights by her sartorial or whimsical proclivities, *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 454, 455–456, 641 F.2d at 944, 945–946, that testimony had no place in this litigation.

**37.** *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 456, 641 F.2d at 946. See also C. MacKinnon, Sexual Harassment of Working Women 46–47 (1979) (discussing futility of resistance requirement for sexual harassment claim).

**38.** *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 456, 641 F.2d at 946.

**39.** See text *supra* at note 17.

**40.** Such evidence could be critical to a plaintiff's case, for a claim of harassment cannot be established without a showing of more than isolated indicia of a discriminatory environment. *Bundy v. Jackson, supra* note 25, 205 U.S.App.D.C. at 453 n. 9, 641 F.2d at 943 n. 9.

**41.** Cf. *EEOC Decision No. 71–909,* Fair Empl. Prac.Cas. (BNA) at 269–270 (maintenance of working environment in which racial insults against blacks are habitual also violation of white employees' statutory rights).

held responsible for any infringements of Title VII by Taylor because it had no notice of the offensive conduct charged to him.[42] To the court, "it seem[ed] reasonable that an employer should not be liable in these unusual cases of sexual harassment where notice to the employer must depend upon the actual perpetrator and when there is nothing else to place the employer on notice." [43] We cannot accept this conclusion or its rationale.

So much as this court has heretofore decided runs counter to the District Court's holding. Nothing before us in *Barnes* suggested that the employer, a federal agency, was aware of the activity of the superior involved, yet we adverted to the general rule that "an employer is chargeable with Title VII violations occasioned by discriminatory practices of supervisory personnel," [44] and rejected the notion that the superior's conduct insulated the employer merely "because it was a personal escapade rather than an agency project." [45]

And in *Bundy,* we reaffirmed our continuing allegiance to the proposition that an employer is answerable for discriminatory acts committed by supervisory personnel,[46] though we were not required there to apply that principle to employers without notice, since those having control over personnel practices had full knowledge of the harassment and did virtually nothing to stop it.[47]

Today, however, we are confronted by the question that was not directly and actively litigated in *Barnes* or *Bundy:* Whether Title VII imposes upon an employer without specific notice of sexual harassment by supervisory personnel responsibility for that species of discrimination.[48] We hold that it does.

With exceptions not relevant here,[49] Title VII provides in pertinent part that

[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect

---

**42.** *Vinson v. Taylor, supra* note 3, 23 Fair Empl. Prac.Cas. (BNA) at 42.

**43.** *Id.* Capital City had a grievance procedure whereby a complaint was first to be made to the aggrieved employee's supervisor, and thereafter the grievance was to be resolved by the division head or the president. *Id.* at 43 (findings of fact ¶ 13). Vinson contended that management had been notified of Taylor's alleged harassing conduct by various means, but the District Court found that the employer had no knowledge of it. *Id.* at 41. The court held that notice to Taylor would not constitute notice to Capital City. *Id.* at 42.

**44.** *Barnes v. Costle, supra* note 26, 183 U.S.App. D.C. at 100, 561 F.2d at 993.

**45.** *Id.* at 99, 561 F.2d at 992. The District Court placed reliance on our observation in *Barnes* that "should a supervisor contravene employer policy without the employer's knowledge and the consequences are rectified when discovered, the employer may be relieved from responsibility under Title VII." *Id.* at 100, 561 F.2d at 993. That statement should not be laden with a significance beyond its function merely as an acknowledgement of holdings in the two cases we there cited. One of those cases, *Miller v. Bank of Am.,* 418 F.Supp. 233 (N.D.Cal.1976), was subsequently reversed on appeal, 600 F.2d 211 (9th Cir.1979); the other, *Howard v. National Cash Register Co.,* 388 F.Supp. 603 (S.D.Ohio 1975), concerned racial slurs, not by supervisory personnel, but co-workers, who differ radi-

cally from supervisors in the scheme of vicarious liability. See *Guidelines, supra* note 30, 29 C.F.R. §§ 1604.11(c), (d) (employer vicariously responsible for sexual harassment by supervisory personnel irrespective of employer's knowledge, but for harassment committed by co-workers only if employer knows or should have known of it). See also *Silver v. KCA, Inc.,* 586 F.2d 138, 142 (9th Cir.1978) (continuing course of racial harassment by co-workers cannot be charged to employer unless employer knows of it and fails to take remedial action). See generally Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 Harv.L. Rev. 1449, 1460–1463 (1984) (discussing employer liability).

**46.** *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 453, 641 F.2d at 943.

**47.** See *id.*

**48.** As framed by the District Court, the issue was "whether Capital received notice of the alleged sexual harassment directed against [Vinson] and allegedly against other female employees of the bank." *Vinson v. Taylor, supra* note 3, 23 Fair Empl.Prac.Cas. (BNA) at 40–41. We think the question properly was whether, irrespective of notice, Capital City would be vicariously responsible under Title VII for that kind of sex discrimination by Taylor.

**49.** See 42 U.S.C. §§ 2000e–2(e), (h) (1982).

to ... terms, conditions, or privileges of employment, because of such individual's ... sex....[50] "Employer" is defined as "a person engaged in an industry affecting commerce" with a workforce of specified size, "and any agent of such a person...;"[51] and "person" includes "associations."[52] Taken literally, then, Title VII as much outlaws sex discrimination by an "agent" of an association as by the association itself;[53] put another way, such discrimination by an "agent" of Capital City is as much an affront to Title VII as it would be if engaged in by Capital City as an entity. It is clear that Taylor, as manager of Capital City's Northeast Branch, was Capital City's "agent" with respect to other employees of that branch,[54] and equally clear that the sexual harassment charged to Taylor was forbidden sex discrimination.[55]

We have encountered nothing impuning our reading of the statutory text as meaning that infractions of Title VII by agents are unlawful employment practices attributable to their employers. The legislative history of Title VII is virtually barren of indications, one way or the other, of a vicarious responsibility for employers.[56] The Senate debates did, however, evoke a few expressions of concern over analogous matters, and these, such as they were, assumed that such a responsibility would exist. Senator Stennis, in opposition to the bill that became Title VII,[57] felt that an employer might be held answerable for discrimination practiced by a labor union from which the employer secured its employees; "[u]nder this title," he stated, "it is altogether possible that individuals would be held responsible for violations over which they have no control."[58] Senator Tower, also a protestant, noted that a specific discriminatory intent was unnecessary, so that "[i]t would appear to be sufficient to show that discrimination does in fact exist."[59] While we are wary of interpretations of a statute voiced by opponents during heated debate, we know that at least the prospect of vicarious employer accountability was raised before Congress.

What the legislative history does not provide can be gleaned, however, from other persuasive indicators of congressional intent. To begin with, the Equal Employment Opportunity Commission (EEOC), has promulgated guidelines which, as "administrative interpretation[s] of the Act by the enforcing agency," are "entitled to great deference,"[60] especially when they are sup-

---

50. *Id.* § 2000e–2(a)(1).

51. *Id.* § 2000e(b).

52. *Id.* § 2000e(a).

53. It appears that Capital City is an unincorporated association, but whatever its organizational form, the definition of "person," see *id.* § 2000e(a), is broad enough to cover it.

54. As the *Guidelines, supra* note 30, prescribe, "[t]he Commission will examine the circumstances of the particular employment relationship and the job junctions [*sic*] performed by the individual in determining whether an individual acts in either a supervisory or agency capacity." 29 C.F.R. § 1604.11(c) (1984).

55. *Bundy v. Jackson, supra* note 25, 205 U.S.App. D.C. at 456, 614 F.2d at 946.

56. See *Barnes v. Costle, supra* note 26, 183 U.S. App.D.C. at 105, 561 F.2d at 998 (MacKinnon, J., concurring) ("[c]ombining the legislative history of the Civil Rights Act turns up no direct statement that employers are to be vicariously liable").

57. H.R. 7152, 88th Cong., 2d Sess. (1963) U.S. Code Cong. & Admin.News 1964, p. 2355.

58. 110 Cong.Rec. 5820 (1964) (remarks of Senator Stennis).

59. 110 Cong.Rec. 8177 (1964) (remarks of Senator Tower, reading a summary analysis of the bill prepared by the National Association of Manufacturers). There was in fact an unsuccessful attempt to amend the bill to incorporate a "willfullness" requirement. See *id.* at 8194 (amendment 507) (presentation of Senator Dirksen).

60. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280, 304 (1975), quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165–166 (1971). In each case, the Court was speaking of EEOC's Guidelines on Employment Testing Procedures, 29 C.F.R. §§ 1607 *et seq.* (1984). We think EEOC's *Guidelines, supra* note 30, are equally "administrative interpretation[s] of the Act by the enforcing agency," and as such, "entitled to great defer-

ported by the statute and not inconsistent with its legislative history;[61] and EEOC's *Guidelines on Discrimination Because of Sex*[62] are unambiguous on the subject:

> Applying general Title VII principles, an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence.[63]

We attach considerable weight to this interpretation, and we agree that treatment of supervisory personnel as "agents" is in conformity with "general Title VII principles".[64] Our cases have established, as the cornerstone of present analysis, that sexual harassment is a violation of Title VII.[65] Neither the statutory language nor its legislative history suggests that, as a trespass on Title VII, it should be treated any differently from transgressions arising out of racial or religious discrimination.[66] And the caselaw in these latter areas establishes beyond cavil that "an employer is chargeable with Title VII violations occasioned by discriminatory practices of supervisory personnel."[67]

▪ We have no difficulty in concluding that an employer may be held accountable for discrimination accomplished

---

ence." See *Gray v. Greyhound Lines, East*, 178 U.S.App.D.C. 91, 98, 545 F.2d 169, 176 (1976) (EEOC interpretation of Title VII entitled to great weight).

**61.** Cf. *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141–146, 97 S.Ct. 401, 410–412, 50 L.Ed.2d 343, 357–359 (1976) (EEOC guidelines not entitled to deference when they conflict with earlier EEOC position, other administrative interpretations, and legislative history).

**62.** 29 C.F.R. §§ 1604.1–1604.11 (1984).

**63.** *Id.* § 1604.11(c).

**64.** See *Bundy v. Jackson, supra* note 25, 205 U.S.App.D.C. at 457, 641 F.2d at 947 (endorsing EEOC guidelines).

**65.** *Id.* at 456, 641 F.2d at 946; *Barnes v. Costle, supra* note 26, 183 U.S.App.D.C. at 102, 561 F.2d at 995. Accord *Guidelines, supra* note 30, 29 C.F.R. § 1604.11(a) (1984).

**66.** The only significant legislative history regarding sex discrimination was generated in conjunction with the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103, 42 U.S.C. §§ 2000e *et seq.* (1982). As we pointed out in *Barnes v. Costle, supra* note 26, 183 U.S.App.D.C. at 94, 561 F.2d at 987, the House Committee on Education and Labor, speaking to that legislation, declared that "[d]iscrimination against women is no less serious than other forms of prohibited employment practices and is to be accorded the same degree of social concern given to any type of unlawful discrimination." H.R.Rep. No. 92–238, 92d Cong., 1st Sess. 5 (1971), *reprinted in* [1972] U.S.Code Cong. & Ad.News 2137, 2141. Once we accept the proposition that sexual harassment is illegal discrimination—as, after *Barnes* and *Bundy*, we must—efforts to eradicate it should proceed with as much fervor as has been directed toward other violations of Title VII.

**67.** *Barnes v. Costle, supra* note 26, 183 U.S.App. D.C. at 100 & n. 71, 561 F.2d at 993 & n. 71 (citing numerous cases); accord *Bundy v. Jackson, supra* note 25, 205 U.S.App.D.C. at 453, 641 F.2d at 943. See also *Calcote v. Texas Educ. Found., Inc.*, 578 F.2d 95, 98 (5th.Cir.1978) (racial harassment by supervisor in course of duties is enough to support finding that supervisor's acts are "deliberate" acts of employer); *Young v. Southwestern Savs. & Loan Ass'n*, 509 F.2d 140, 144 n. 7 (5th Cir.1975) (employer responsible under Title VII for supervisor's religious discrimination although supervisor had no authority to fire and employer had no opportunity to correct problem); *Anderson v. Methodist Evangelical Hosp., Inc.*, 464 F.2d 723, 725 (6th Cir.1972) (employer answerable under Title VII for supervisor's racially discriminatory discharge of employee despite employer's "outstanding record in regard to fair and impartial treatment of the races"); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir.1977) (employer liable under Title VII for any race-based violation occasioned by any person in authorized capacity as supervisor).

EEOC, too, has found employers in violation of Title VII where a supervisor imposed or maintained a discriminatory work environment. See, *e.g., EEOC Decision No. 71–909, supra* note 41, 3 Fair Empl.Prac.Cas. (BNA) at 269 (employer responsible for racial intimidation caused by supervisor's habitual use of demeaning racial epithet); *EEOC Decision No. 71–2042*, 3 Fair Empl.Prac.Cas. (BNA) 1102, 1103 (1971) (employer responsible for supervisor's insistence that black employees address her as "maam").

through sexual harassment [68] by any supervisory employee with authority to hire, to promote or to fire. An employer's delegation of this much authority vests in the supervisor such extreme power over the victimized employee that the supervisor's stature as an "agent" of the employer cannot be doubted. We do not believe, however, that vicarious responsibility is limited to discrimination by supervisors so richly endowed. The mere existence—or even the appearance [69]—of a significant degree of influence in vital job decisions gives any supervisor the opportunity to impose upon employees. That opportunity is not dependent solely upon the supervisor's authority to make personnel decisions; the ability to direct employees in their work, to evaluate their performances and to recommend personnel actions carries attendant power to coerce, intimidate and harass.[70] For this reason, we think employers must

answer for sexual harassment of any subordinate by any supervising superior.[71]

In so holding, we consider only the statutory language and interpretations authoritatively placed upon it. We do not resort to the common-law doctrine of respondeat superior.[72] Echoing the words of the Supreme Court in an analogous context, "[i]t will not do, for deciding the question as one of uniform national application, to import wholesale the traditional common-law conceptions.... That result hardly would be consistent with the statute's broad terms and purposes." [73]

Traditional principles of respondeat superior, as they obtain in the field of torts, are not altogether suitable for resolution of questions of Title VII law.[74] The explanation is manifest: Title VII is a mandate from Congress to cure a perceived evil—certain types of discrimination in employ-

**68.** In determining the appropriateness of attribution, enough specificity must be imparted to "harassment" to filter out personal relationships that are not products of employment-related intimidation. For purposes of this case, we are well served by the criteria reflected in the EEOC *Guidelines.* See 29 C.F.R. § 1604.11(a) (1984), quoted in relevant part *supra* note 30. The touchstone of these criteria is that sexual advances must be unwelcome, and must in some way amount to an explicit or implicit term or condition of employment in the sense either of job status or work environment.

**69.** See *Young v. Southwestern Savs. & Loan Ass'n, supra* note 67, 509 F.2d at 144 n. 7 (despite supervisor's lack of actual authority to fire, employer cannot disclaim responsibility for religious discrimination by supervisor whose actions appeared to be authorized).

**70.** The District Court found that all salary increases, bonuses and promotions were determined by officials other than Taylor, but that Taylor made written recommendations respecting employees in his branch under consideration therefor. *Vinson v. Taylor, supra* note 3, 23 Fair Empl.Prac.Cas. (BNA) at 43 (findings of fact ¶ 9). Notwithstanding this finding, the court indicated some concern because "there was no evidence as to Taylor's status in the bank, that is, whether the title Assistant Vice President is honorary or whether that title confers upon Taylor some greater responsibility and relationship to the management of the bank." *Id.* at 42. In light of the finding that Taylor submitted recommendations on compen-

sation and promotion, no further involvement in the decisional process was needed.

**71.** The bare existence of a company policy of nondiscrimination does not affect the employer's chargeability. E.g., *Guidelines, supra* note 30, 29 C.F.R. § 1604.11(c) (1984), quoted in text *supra* at note 63; *Weins v. Boorstin,* 19 Fair Empl.Prac.Cas. (BNA) 186, 187–188 (D.D.C. 1979) (employer responsible for recruitment officer's discrimination despite dissemination of equal-opportunity guidelines). Capital City had such a policy, *Vinson v. Taylor, supra* note 3, 23 Fair Empl.Prac.Cas. (BNA) at 43 (findings of fact ¶ 15), but it affords small comfort when violations go unrectified.

**72.** But see *Miller v. Bank of Am., supra* note 45, 600 F.2d at 213, though we embrace the court's result.

**73.** *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 124–125, 64 S.Ct. 851, 857–858, 88 L.Ed. 1170, 1181 (1944) (declining to incorporate common-law definition of "employee" into National Labor Relations Act without specific congressional authorization). See also *Tidwell v. American Oil Co.,* 332 F.Supp. 424, 436 (D.Utah 1971) (attributing supervisor's acts to employer and distinguishing contrary decision on ground that it dealt with agency rules for common-law tort).

**74.** *Barnes v. Costle, supra* note 26, 183 U.S.App. D.C. at 107, 561 F.2d at 1000 (concurring opinion) (noting instances when common-law rule should be ousted).

ment—in a prescribed fashion.[75] Rules of tort law, on the other hand, have evolved over centuries to meet diverse societal demands by allocating risks of harm and duties of care. Without clear congressional instruction, we think it unsafe in developing Title VII jurisprudence to rely uncritically on dogma thus begotten.

More particularly, limitations imposed by the doctrine of respondeat superior have no place in enforcement of the congressional will underlying Title VII. Confining liability, as the common law would, to situations in which a supervisor acted within the scope of his authority conceivably could lead to the ludicrous result that employers would become accountable only if they explicitly require or consciously allow their supervisors to molest women employees.[76] While modern courts seem more inclined to treat intentional misconduct on the job as arising out of and in the course of the employment,[77] and thus as providing a basis for liability under a somewhat expanded theory of respondeat superior, there simply is no need to so confine either the analysis or the solution where Title VII applies.[78]

To hold that an employer cannot be reached for Title VII violations unknown to him is, too, to open the door to circumvention of Title VII by the simple expedient of looking the other way, even as signs of discriminatory practice begin to gather on the horizon. As the Ninth Circuit has said, "[s]uch a rule would create an enormous loophole in the statutes,"[79] one we think the courts should strive to seal. Instead of providing a reason for employers to remain oblivious to conditions in the workplace, we think the enlightened purpose of Title VII calls for an interpretation cultivating an incentive for employers to take a more active role in warranting to each employee that he or she will enjoy a working environment free from illegal sex discrimination.[80] A higher level of imputed responsibility than respondeat superior imposes is one way to guard against the danger that disobedience of Title VII will escape scrutiny and go unremedied.

Employer responsiveness to on-the-job discrimination at the supervisory level is an essential aspect of the remedial scheme embodied in Title VII. It is the employer alone who is able promptly and effectively to halt discriminatory practices by supervisory personnel, and only the employer can provide reinstatement, backpay or other remedial relief contemplated by the Act.[81] Much of the promise of Title VII will become empty if victims of unlawful discrimination cannot secure redress from the only source capable of providing it.

A requirement of knowledge by the employer of Title VII transgressions by supervisory personnel would effectively eliminate vicarious Title VII responsibility alto-

75. See *Griggs v. Duke Power Co., supra* note 60, 401 U.S. 424, 429, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163 (1971) ("[t]he objective of Congress in the enactment of Title VII is plain from the language of the statute").

76. See Significant Development, *New EEOC Guidelines on Discrimination Because of Sex: Employer Liability for Sexual Harassment Under Title VII,* 61 B.U.L.Rev. 535, 539 (1981) (under strict common-law test vicarious Title VII responsibility would be rare).

77. See W. Prosser & W. Keeton, Law of Torts 505–507 (5th ed. 1984).

78. Indeed, notwithstanding the modern trend in the tort field, courts could find intentional acts outside the scope of employment when committed for purely personal reasons. See *Corne v. Bausch & Lomb, Inc.,* 390 F.Supp. 161, 163 (D.Ariz.1975) (no Title VII claim against em-

ployer because supervisor's harassing conduct was nothing more than personal proclivity), *vacated and remanded,* 562 F.2d 55 (9th Cir.1977).

79. *Miller v. Bank of Am., supra* note 45, 600 F.2d at 213.

80. "Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned." *Guidelines, supra* note 30, 29 C.F.R. § 1604.11(f) (1984).

81. See 42 U.S.C. § 2000e–5(g) (1982) (remedies available under Title VII).

gether. It would reserve Title VII liability for only those employers who fail to redress known violations—a direct, not a substitutional, theory of attribution. This would be a retreat from the level of protection Title VII has consistently and de-. signedly afforded,[82] and take a backward step we refuse to endorse.

In sum, we hold that Vinson alleged facts sufficient to state a claim of sex discrimination cognizable under Title VII, and that any discriminatory activity by Taylor is attributable to Capital City. Vinson is entitled to an adjudication of that claim on the evidence, considered in light of the legal principles applicable. To that end, we reverse the judgment appealed from and remand the case to the District Court for proceedings consistent with this opinion.

*So ordered.*