Johnnie Mae **MITCHELL**, Plaintiff,

v.

**OsAIR, INC.**, Defendant.

No. Civ. A. C 82–1759.

United States District Court, N.D. Ohio, E.D.

March 5, 1986.

Terry Gilbert, Carter R. Dodge, Anthony A. Walsh, Cleveland, Ohio, for plaintiff.

Melvyn E. Resnick, Dworkin & Bernstein, Cleveland, Ohio, for defendant.

MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Pending before the Court is a motion for reconsideration filed by Johnnie Mae Mitch-

ell following a bench trial which resulted in a judgment for defendant OsAir, Inc. ("OsAir") on October 31, 1984. Mitchell asks this Court to reconsider its decision pursuant to Fed.R.Civ.P. 60(b) ("Rule 60(b)"), because of recently developed case law holding that an employer is responsible for all acts of sexual harassment by its supervisory personnel, even when the employer does not have specific notice of the discriminatory conduct. For the reasons set forth below, Mitchell's motion for reconsideration is granted, and judgment is entered for Mitchell on her causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1982) ("Title VII").

## I.

Mitchell's complaint alleged that she was racially and sexually harassed, and eventually discharged, in violation of Title VII and Title 42 U.S.C. § 1981 (1982) ("§ 1981"). At the conclusion of plaintiff's case at trial, the Court granted OsAir's motion to dismiss the discriminatory discharge claim, because Mitchell had not proved that her termination was the result of racial or sexual discrimination. Trial continued on the harassment claims, and the Court made the following findings of fact:

Johnnie Mae Mitchell is a black woman who worked as a secretary-receptionist for OsAir from August 7, 1979 to April 14, 1980 when she was terminated. OsAir is a corporation which maintains a number of plants and offices in Ohio and is an employer subject to the provisions of Title VII. Mitchell worked at the OsAir facility located on Carnegie Avenue in Cleveland's inner city. It was one of five OsAir stores which sold welding supplies to manufacturing plants and individual buyers. Although Mitchell was not the only black employee at the store, she was the only woman among the seven or eight persons who worked at the store during the relevant time period. Mitchell's duties included answering telephones, taking customer orders, writing orders for truck drivers, waiting on cus-

tomers and keeping various records. The other employees at the facility included a salesman, several truck drivers and dock workers, and the store supervisor.

Company owner Rick Osborne visited the store regularly, but kept his main office at another store located in Mentor. During the eight months Mitchell worked for OsAir, she had three different supervisors. The first was Mike Kandus, who interviewed her and was the store manager when she was hired. Kandus was later replaced by Larry Kelley, who was store manager during most of Mitchell's employment. Mike Gorman, who was a salesman when Mitchell was hired, replaced Larry Kelley about a month and a half before Mitchell was fired. The sexual harassment claims at issue involve Gorman's treatment of Mitchell.

Shortly after Mitchell began working at OsAir, a remodeling project was started. A wall of the store was torn down, eliminating the division between the store and the dock where trucks were loaded, and exposing the store area to the elements. As the remodeling progressed, employees' desks and working areas were rearranged and, for a time, moved out of the store and placed on the dock.

Tensions surfaced between Gorman and Mitchell in the fall when Gorman was still a salesman. During this time, Mitchell reported to, and received instructions from, store manager Mike Kandus, but was also responsible for doing some typing for Gorman. Sometime in October or November, the clashes between Gorman and Mitchell came to Osborne's attention and he met with Mitchell and Gorman at a McDonald's restaurant to discuss the problem. Mitchell told Osborne that she did not like the way Gorman had been treating her, but, she testified, because she did not initiate the meeting, she did not say much about Gorman's actions. Osborne told Gorman "You do have a way of talking down to these people", and told Gorman and

Mitchell to get along and work together. Gorman testified that he believed Mitchell and Gorman had a personality conflict. After their meeting with Osborne, Mitchell continued to experience problems with Gorman. He continuously called Mitchell "Rick's little nigger" and, during telephone conversations calculated to be overheard by Mitchell, referred to blacks as "slaves", "motherfuckers", and "cocksuckers".

At the height of the store's construction, Gorman told Mitchell she had been hired because Osborne did not want a white woman to work under such difficult conditions. Conditions were such that, at various times, all the employees worked together on the unheated dock during the winter; the bathrooms were torn out; there was no running water; and portable toilets were in use. Gorman would make gestures toward his genitals and urinate on the dock in full view of Mitchell when she was working at her desk on the dock. During this time, Mitchell was reluctant to complain to Osborne about Gorman because other employees had told her that Osborne and Gorman were related by marriage. Gorman had been working for Osborne since 1971. Mitchell was told that employees who had trouble with Gorman could lose their jobs, as had others in the past.

After Gorman became store manager, Mitchell's situation worsened. The remodeling was completed and new bathrooms were installed, one for men and one for women. Gorman moved his desk in front of the women's bathroom and remarked on the frequency or infrequency of Mitchell's visits to the ladies' room. Gorman used the women's bathroom instead of the men's room, a practice that other employees testified was not customary, and left *Playboy* magazines displayed in the women's room. When Osborne's girlfriend, during a visit to the store, observed the magazines in the women's room and asked Mitchell if the magazines were hers, Mitchell told her they belonged to Gorman.

It was Mitchell's habit to arrive at work about twenty minutes early and read her prayer book before she began working at eight o'clock. After Gorman became manager, he forbade Mitchell to read her prayer book at work. He compared Mitchell to a black character, Aunt Esther, on the television situation comedy, "Sanford & Son", and told Mitchell he didn't know how to treat blacks. When Mitchell suggested Gorman treat her as he would any other woman, his sister, his mother, or his wife, Gorman replied he couldn't do that because Mitchell wasn't white. At another time, Gorman told Mitchell that his only sexual experience with a black woman occurred in college when he did work in a cancer research lab and saw a black woman's breast preserved in formaldehyde.

On another occasion, Gorman told a representative from another company with whom he did business that Mitchell "gave good service" and, at his suggestion, the company representative called her, asking explicit sexual questions and making verbal sexual advances. When Mitchell gave a negative response, the company representative was at first surprised, and then apologized. He visited the office the afternoon of the telephone call to talk to Gorman and apologize to Mitchell. Gorman admitted setting up the call. Mitchell accepted the apology.

In sum, Gorman subjected Mitchell to a relentless barrage of sexual innuendos and racial slurs. His actions were, however, limited to creating a hostile and offensive working environment fraught with harassment. He never took any action against Mitchell which resulted in any tangible job detriment, such as loss of wages or loss of promotional opportunities. In its bench ruling, this Court specifically found that Mitchell's discharge was not the result of sex or race discrimination, and that her termination could not be deemed a constructive discharge. Hence, the inquiry in this case now is limited to whether Gorman's behavior towards Mitchell violated Title VII and 42 U.S.C. § 1981.

*Mitchell v. OsAir, Inc.*, No. C82–1759, slip op. at 2–6 (N.D. Ohio Oct. 31, 1984) (footnotes omitted).

This Court then recited the five elements of proof that had to be sustained by Mitchell: 1) that she belonged to a protected group; 2) that she was subject to unwelcome sexual or racial harassment; 3) that the harassment complained of was based on sex or race; 4) that the harassment complained of affected a "term, condition, or privilege" of employment; and 5) *respondeat superior*. *Id.* at 8 (citing *Henson v. City of Dundee*, 682 F.2d 897, 903–905 (11th Cir.1982)). The Court found that "[t]he evidence in this case clearly established that Mitchell was a woman who was repeatedly exposed to a verbal onslaught of sexual epithets and tasteless innuendo that she would not have been exposed to if she were a man." *Id.* Similarly, it found that "the same evidence of sex discrimination established a claim of race discrimination because it is impossible to separate the racial remarks about a 'black breast', 'Rick's little nigger' and 'Aunt Esther' from Gorman's ongoing offensive sexual harassment." *Id.* at 13. Thus, the first four components of the *Henson* test were established for both the racial and sexual harassment claims under Title VII. *Id.* at 9, 13–14.

However, the Court held that the *respondeat superior* element had not been proved by Mitchell. In its discussion of this element, the Court distinguished between "hostile environment" cases, where an employee is subjected to an offensive working environment, and *quid pro quo* cases, where tangible job benefits or detriments are conditioned upon an employee's submission to sexual advances. The Court concluded that only the former type of sexual harassment required proof of the employer's knowledge. *Id.* at 11–12. The Court found that "[t]he evidence conclusively established that Mitchell did not complain to anyone about Gorman's treatment of her." *Id.* at 10. Since Mitchell's claims were hostile environment claims, her inability to show OsAir's knowledge of her

harassment by Gorman stood as an obstacle to this Court's imposition of *respondeat superior* liability upon the defendant. *Id.* at 12, 14. The Court also found for OsAir on the § 1981 claim on other grounds.

Following this Court's decision, Mitchell appealed this action to the United States Court of Appeals, Sixth Circuit ("Sixth Circuit"), and OsAir cross-appealed. While the appeal was pending, but more than ten days after the judgment of this Court was rendered, Mitchell submitted to this Court a motion for relief from judgment, citing the recently decided *Vinson v. Taylor*, 753 F.2d 141 (D.C.Cir.1985), for the proposition that an employer's knowledge of sexual harassment is not a prerequisite for holding the employer liable in either a *quid pro quo* or a hostile environment case. This Court determined that it had no jurisdiction to consider the motion, because Mitchell's untimely motion to alter or amend judgment under Fed.R.Civ.P. 59(e) was filed following a notice of appeal. Although the Court indicated its inclination to grant Mitchell's motion under Rule 60(b) if it were accorded jurisdiction through a remand by the Sixth Circuit, it denied Mitchell's motion. *Mitchell v. OsAir, Inc.*, No. C82–1759, slip op. (N.D. Ohio April 3, 1985).

Mitchell filed a motion with the Sixth Circuit requesting a remand for this Court to rule on its motion for reconsideration by following the procedure established in *First National Bank of Salem, Ohio v. Hirsch*, 535 F.2d 343 (6th Cir.1976). The Sixth Circuit, determining that *Hirsch*'s methodology had been complied with, granted Mitchell's motion and remanded both Mitchell's appeal and OsAir's cross-appeal. *Mitchell v. OsAir, Inc.*, 772 F.2d 907 (6th Cir.1985). Thus, Mitchell's motion for review of this court's decision in light of *Vinson* and subsequent cases is properly before the Court.

## II.

OsAir argues that consideration of Mitchell's motion should be stayed until the

Supreme Court has reviewed the issue of strict employer liability for sexual harassment in *Vinson v. Taylor*, 753 F.2d 141 (D.C.Cir.), *cert. granted sub nom. PSFS Savings Bank v. Vinson*, —— U.S. ——, 106 S.Ct. 57, 88 L.Ed.2d 46 (1985). The petition for certiorari in the case that Mitchell relies upon in her motion for reconsideration presents the following questions:

(1) Do allegations that supervisory male employee made sexual advances toward subordinate female employee, without any loss or threatened loss of tangible job benefits, state claim of employment discrimination because of sex in violation of Title VII of 1964 Civil Rights Act? (2) Is employer absolutely liable under Title VII for supervisor's sexual advances where employer neither knew nor reasonably could have known of, had no opportunity to stop, and did not intend to permit, sexual advances? (3) Is evidence that complaining employee invited and welcomed her supervisor's sexual advances and voluntarily engaged in workplace sexual conduct admissible in defense of her Title VII claim?

*Vinson*, 54 U.S.L.W. 3022 (U.S. July 23, 1985) (No. 84–1979).

■ OsAir submits that its request for a stay is supported by Fed.R.Civ.P. 1 ("Rule 1"), which provides that the federal rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." It argues that judicial economy would be undermined by what could be an "unnecessary duplication of actions." Defendant's Motion for Stay of Proceedings at 2. OsAir also maintains that the Sixth Circuit always stays actions before it when an identical issue is pending before the Supreme Court.

OsAir's single-minded reliance on Rule 1's command that the rules should be construed to resolve actions inexpensively ignores the rule's requirement that such resolutions shall also be just and speedy. This Court has already found that OsAir's employee Gorman has sexually and racially harassed Mitchell in violation of Title VII. Thus, postponing its consideration of

whether *Vinson* requires a change in this Court's decision would delay for many months what could be the just resolution of this case—the award of relief to a plaintiff who was subjected to conduct that Title VII was meant to prohibit. Further, this district court is not subject to any procedure which the Sixth Circuit may have adopted to reserve ruling on cases which present issues pending before the Supreme Court. Indeed, the existence of such a standing policy in the Sixth Circuit is not clearly established by OsAir. Appended to its motion for stay, OsAir has attached two orders which stay cases where pending Supreme Court cases are relevant. However, neither order cites a Sixth Circuit rule or case mandating the stay, and these two cases appear to involve an exercise of the discretion of the court, rather than a mandatory procedure. Finally, this Court recognizes the possibility that the Supreme Court will dispose of *Vinson* on an issue other than that implicated in this case. If Mitchell were forced to wait many more months for reconsideration of her case only to find that the Supreme Court's actions had no bearing on this action, justice would be impeded. Thus, OsAir's motion for a stay of this motion for reconsideration is denied.

### III.

*Vinson v. Taylor*, 753 F.2d at 141, is the first case to squarely confront the issue of whether employers should be strictly liable for sexual harassment of employees by their supervisors in hostile environment cases, as well as in *quid pro quo* cases. In *Vinson*, the plaintiff brought her action under Title VII against her supervisor, Sidney Taylor, and her employer, Capital City Federal Savings and Loan Association ("Capital City"). Vinson admitted that she ultimately yielded to Taylor's demand that they have sexual relations because she feared that continuous refusals would lead to the loss of her employment. *Id.* at 143. She also testified that she was later forced to submit to Taylor's sexual advances at her place of employment, and that he often

assaulted and raped her. *Id.* at 143–144. However, Vinson also alleged that Taylor sometimes caressed her at work, followed her into the women's room, and exposed himself to her. *Id.* at 144. The United States Court of Appeals for the District of Columbia Circuit ("District of Columbia Circuit") opined that the claim stated by Vinson implicated the hostile environment variety of sexual harassment, remanding the case to the district court for consideration of whether this type of Title VII violation had been proved. *Id.* at 145.

In the proceedings before the district court, Capital City had argued that its lack of knowledge of Taylor's behavior prevented a finding of liability against it. The District of Columbia Circuit, noting that the issue had not been directly litigated before, concluded that an employer should be liable for the sexual harassment of an employee by a supervisor despite lacking specific knowledge of the supervisor's conduct. The court arrived at this conclusion following a review of the applicable Title VII provisions, the statute's legislative history, and the interpretation of the statute by the Equal Employment Opportunity Commission ("EEOC"), the administrative body responsible for the enforcement of Title VII.

First, the court examined § 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1) (1982), which provides in pertinent part that "[I]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." Since the term "employer," as defined in § 701(b) of Title VII, 42 U.S.C. § 2000e(b) (1982), includes "any agent of [a person engaged in an industry affecting commerce with a workforce of specified size]," the court had little trouble deciding that Taylor's activity was prohibited conduct, since he was an agent of Capital City with respect to employees whom he supervised. *Id.* at 148. Noting that "such discrimination by an 'agent' of Capital City is as much an affront to Title VII as it would be if engaged in by Capital City as

an entity," the court read the statutory text as meaning that "infractions of Title VII by agents are unlawful employment practices attributable to their employers." *Id.* Since the legislative history is "virtually barren of indications, one way or the other, of a vicarious responsibility for employers," *id.*, the court looked to the EEOC guidelines on sexual harassment. On the issue of employer liability, the EEOC has stated:

> Applying general Title VII principles, an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence.

29 C.F.R. § 1604.11(c) (1985). The *Vinson* court accorded great deference to this interpretation, as being consistent with the statutory language and not inconsistent with the legislative history of Title VII. *Id.* at 149.

The *Vinson* court stated that its construction of the statute required that it reject the tort theory of *respondeat superior* to remedy abuses of supervisors given their power over their subordinates by the employer. Imposing a knowledge requirement upon employer liability would "open the door to circumvention of Title VII by the simple expedient of looking the other way." *Id.* at 151. Since the employer alone can promptly and efficiently halt sexual harassment by its supervisors, the court concluded that employer liability for supervisors is crucial to the remedial purposes of Title VII. *Id.*

No court identifying the issue reached in *Vinson* since that decision has repudiated *Vinson*'s conclusion on strict employer liability for sexual harassment. *Vinson*'s holding was specifically adopted in *Jeppsen v. Wunnicke*, 611 F.Supp. 78 (D.Alaska 1985), a hostile environment case. Moreover, the United States Court of Appeals,

Seventh Circuit has independently decided to adopt the EEOC's guideline on strict liability for sexual harassment. *Horn v. Duke Homes,* 755 F.2d 599 (7th Cir.1985). Other courts recognizing *Vinson*'s holding on strict liability have resolved their cases upon other grounds. *See Scott v. Sears, Roebuck and Co.,* 605 F.Supp. 1047, 1055 (N.D.Ill.1985); *Vermett v. Michigan Department of State Police,* 627 F.Supp. 587 (W.D.Mich.1986). The Sixth Circuit's most recent discussion of racial harassment seemingly requires proof of actual knowledge for employer liability, but the case was brought under § 1981, rather than Title VII. *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250 (6th Cir.1985), *petition for cert. denied,* —— U.S. ——, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986). However, OsAir's objections to the *Vinson* decision must be examined before the Court will adopt its rationale.

## IV.

OsAir contends that *Vinson* is factually distinguishable from the action at bar. First, it states that *Vinson* was actually a *quid pro quo* case, since "the facts of *Vinson do not* present a true hostile environment scenario." Defendant's Brief of Facts and Law Regarding *Vinson v. Taylor* at 2. OsAir maintains that since Vinson was fired, the case is properly analyzed as a *quid pro quo* case. This argument ignores the appellate court's recitation of Taylor's caressing Vinson, following her into the women's room, exposing himself, and even raping her. The circuit court clearly remanded the case because it ruled that the district court had erred in its failure to consider the case as a hostile environment claim. It cannot be seriously contended that sexual harassment by a supervisor must be exclusively *quid pro quo* or hostile environment; thus, the facts which implicated hostile environment were not to be dismissed solely because the trial court found no sexual harassment resulting in adverse job action. The *Jeppsen* court specifically rejected its defendant's attempt to argue that *Vinson* did not implicate a hos-

tile environment situation. 611 F.Supp. at 80.

Second, OsAir asserts that a distinction about the notice to the employers in these cases is critical. Particularly, it urges that notice was a hotly contested issue in the *Vinson* case, while in this case it is clear that Mitchell did not notify OsAir in any way of her problems with Gorman. However, this difference between the cases is illusory, since the district court in *Vinson* found that Capital City had no notice—in essence, the same finding as in this case. Thus, the *Vinson* case was in the same factual posture as this case is when the appellate court concluded that notice to the employer is irrelevant to the determination of employer liability.

OsAir also argues that the *Vinson* decision is erroneous from a legal theoretical standpoint. It relies upon the distinction between *quid pro quo* harassment and hostile environment harassment to make its point. *Quid pro quo* cases, OsAir asserts, permit employer liability because the employee's job status is affected by the supervisor who is given apparent authority by the employer. In contrast, OsAir maintains, hostile environment claims implicate actions taken in isolation, without the threat or occurrence of job benefits or detriments, even though they are taken by a supervisor. OsAir explains that the equitable remedies available in Title VII actions require that this distinction between the two types of sexual harassment actions involving supervisory personnel be maintained when deciding employer liability. The availability of reinstatement, back and front pay, injunction, and declaratory relief require employer liability in *quid pro quo* cases, because employees who have suffered a tangible employment injury can be made whole only by one of these remedies, which can only be sought from the employer. However, the remedies which would appear best suited to hostile environment cases—compensatory and punitive damages—are not available in Title VII cases. Since an employer cannot be found liable for compensatory and punitive damages,

OsAir concludes, there is no reason to find the employer liable at all in hostile environment cases.

This argument, while superficially persuasive, suffers from two major flaws. First, OsAir's characterization of hostile environment claims against supervisors ignores the reality of workplace politics. Hostile environment is merely one position on the continuum of sexual harassment, and the threat of job detriment is no less real for being implied rather than explicit:

> Sexual harassment as a working condition often does not require a decisive yes or no to further involvement. The threat of loss of work explicit in the *quid pro quo* may be only implicit without being any less coercive. Since communicated resistance means that the woman ceases to fill the implicit job qualifications, women learn, with their socialization to perform wifelife tasks, ways to avoid the open refusals that anger men and produce repercussions. This requires "playing along," constant vigilance, skillful obsequiousness, and an ability to project the implication that there is a sexual dimension to, or sexual possibilities for, the relationship, while avoiding the explicit "how about it" that would force a refusal into the open.

C. MacKinnon, Sexual Harassment of Working Women 44 (1979). Moreover, a supervisor confronted by a woman subordinate who refuses to tolerate a hostile environment can alter working conditions in subtle ways which would probably not be recognized by a *quid pro quo* claim—by giving her less desirable assignments, worse evaluations of her performance, more heavy-handed treatment in the details of day-to-day employment. Thus, OsAir's contention that hostile environment claims against supervisors involve conduct that does not threaten a noncompliant employee with job losses cannot be accepted.

■ Second, OsAir's theory that there is no relief that employers in a hostile environment can be liable for is faulty. This Court agrees that Title VII relief does not include compensatory damages. *Bun-*

*dy v. Jackson,* 641 F.2d 934, 946, n. 12 (D.C.Cir.1981); *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1107 (6th Cir.1981). Neither are back pay or reinstatement available in hostile environment cases. *Bundy,* 641 F.2d at 946, n. 12. However, other relief is available. In *Bundy,* the first case to recognize the viability of hostile environment claims under Title VII, the court directed the trial court on remand to fashion injunctive relief against the employer which would require affirmative steps to prevent recurrence of harassing conduct. *Id.* at 946–947. Furthermore, several courts have stated that an award of attorneys' fees pursuant to § 706 of Title VII, 42 U.S.C. § 2000e–5(k) (1982) ("§ 706"), is appropriate when the plaintiff in a hostile environment case has prevailed. *Bundy,* 641 F.2d at 946, n. 12; *Henson,* 682 F.2d at 905; *McKinney v. Dole,* 765 F.2d 1129, 1140, n. 25 (D.C.Cir.1985).

OsAir's critique of the paucity of remedies for which employers in hostile environment cases could be strictly liable is well taken, but is an indictment of Title VII's failure to adequately recompense plaintiffs who have suffered from intolerable work environments, rather than a reason for not holding employers strictly liable. There is little incentive for a plaintiff to bring a Title VII suit when the best that she can hope for is an order to her supervisor and to her employer to treat her with the dignity she deserves and the costs of bringing her suit. One can expect that a potential claimant will pause long before enduring the humiliation of making public the indignities which she has suffered in private, as well as the anticipated claims that she has "consented", and the attempts to trivialize her concerns, when she is precluded from recovering damages for her perpetrators' behavior. It is, however, the responsibility of Congress, rather than this Court, to recognize and repair this deficiency in the statute.

■ This Court can ascertain no justification why the sound reasoning of the *Vinson* court should not be adopted. This Court's conclusion that strict employer lia-

bility is in conformity with Title VII applies equally to Mitchell's claims of racial and sexual harassment. Since the Court has previously found that Mitchell has proved the first four elements of the *Henson* test, the Court's present holding that strict employer liability replaces the *respondeat superior* element requires judgment in favor of Mitchell on both the sexual and racial discrimination claims arising under Title VII.

### V.

The relief to which Mitchell is entitled remains an issue. Since the Court found that Mitchell's termination was unrelated to the sexual harassment she suffered, she cannot be awarded back pay, front pay, or reinstatement. Since she no longer works for OsAir, and apparently will not be reinstated, injunctive relief is not permissible. *See Bundy,* 641 F.2d at 946, n. 13 (request for injunctive relief is moot where there is no reasonable expectation that the conduct will recur). However, Mitchell is entitled to the satisfaction of having prevailed in her day in court. Thus, this Court's judgment for OsAir on the sexual and racial harassment claims under Title VII is reversed, and declaratory judgment on these claims is entered for Mitchell. Moreover, Mitchell will be awarded attorneys' fees pursuant to § 706 of Title VII. Mitchell shall submit a memorandum of law and documentation of her attorney hours spent on her successful claims within thirty (30) days.

IT IS SO ORDERED.